DEPARTMENT OF DEFENSE, ARMY–
AIR FORCE EXCHANGE SERVICE,
and Army-Air Force Exchange Service,
Dix-McGuire Exchange, Fort Dix, New
Jersey, Petitioners,

v.

FEDERAL LABOR RELATIONS
AUTHORITY, Respondent,

American Federation of Government
Employees, AFL–CIO, Intervenor.

DEPARTMENT OF DEFENSE, DEPART-
MENT OF the AIR FORCE, Air Force
Logistics Command, and Air Force Lo-
gistics Command, Wright-Patterson Air
Force Base, Ohio, Petitioners,

v.

FEDERAL LABOR RELATIONS
AUTHORITY, Respondent,

American Federation of Government
Employees, AFL–CIO, Intervenor.

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES,
AFL–CIO, Petitioner,

v.

FEDERAL LABOR RELATIONS
AUTHORITY, Respondent,

Department of Defense, et al.,
Intervenors.

Nos. 80–1119, 80–1351 and 80–1358.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 1, 1981.

Decided July 2, 1981.

Howard S. Scher, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., at the time the briefs were filed, Washington, D. C., and William Kanter, Atty., Dept. of Justice, Washington, D. C., were on the brief, for petitioners in No. 80–1119.

Douglas N. Letter, Atty., Dept. of Justice, Washington, D. C., with whom Thomas S. Martin, Acting Asst. Atty. Gen., at the time the briefs were filed, Washington, D. C., and William Kanter, Atty., Dept. of Justice, Washington, D. C., were on the brief, for petitioners in No. 80–1351 and intervenors in No. 80–1358.

William J. Stone, Washington, D. C., with whom James R. Rosa and Charles A. Hobbie, Washington, D. C., were on the brief, for American Federation of Government Employees, petitioner in No. 80–1358 and intervenor in Nos. 80–1119 and 80–1351.

Steven H. Svartz, Atty., Federal Labor Relations Authority, Washington, D. C., with whom Elizabeth Medaglia, Associate Sol., Federal Labor Relations Authority, Washington, D. C., was on the brief, for respondent.

Janet Cooper and Catherine Waelder, Washington, D. C., were on the brief for *amicus curiae* National Federation of Federal Employees in No. 80–1119, urging affirmance.

Before ROBINSON, Chief Judge, WRIGHT, Circuit Judge, and VAN PELT,* Senior District Judge.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

* Of the United States District Court for the District of Nebraska, sitting by designation pursuant to 28 U.S.C. § 294(d) (1976).

1. Pub.L.No. 95–454, 92 Stat. 1111 (1978). The issues in this case all involve the Labor-Management Relations chapter, 5 U.S.C. § 7101 *et seq.* (Supp. III 1979), which is one title (Title VII) of the Civil Service Reform Act. Unless otherwise indicated, all section numbers in this opinion refer to provisions of Title VII of the Reform Act and thus to Title 5 of the United States Code (Supp. III 1979).

2. Section 7114(a)(4), 5 U.S.C. § 7114(a)(4), requires the parties to meet and negotiate in good faith for the purpose of arriving at a collective bargaining agreement. The duty to bargain extends generally to "conditions of employment," *see* 5 U.S.C. § 7102, a term that is broadly defined by § 7103(a)(14), 5 U.S.C. § 7103(a)(14).

3. The statute clearly imposes no duty to bargain over proposals that would be "inconsistent with any Federal law or any Government-wide rule or regulation." 5 U.S.C. § 7117. Section 7106, the "management rights" section of the Reform Act, also enumerates certain areas of management authority regarding which management either cannot, *see* 5 U.S.C. § 7106(a), or need not, *see* 5 U.S.C. § 7106(b)(1), bargain.

4. 5 U.S.C. § 7106(a).

Senior District Judge VAN PELT concurs except as to Proposal III, as to which he would reverse.

## J. SKELLY WRIGHT, Circuit Judge:

The Civil Service Reform Act of 1978[1] requires management officials of the federal agencies to bargain with employee representatives over conditions of employment.[2] But the duty to engage in collective bargaining is not absolute.[3] Section 7106 of the Reform Act enumerates certain reserved rights of management that cannot be lawful subjects of negotiation.[4] It is permissible to bargain over the "procedures" by which those rights are exercised, but not over the substance of the rights themselves.

These consolidated cases[5] raise important questions about the scope of management's duty to bargain under Section 7106. The issue arose when agency management re-

5. Three appeals are consolidated for decision. They arise from two cases decided by the Federal Labor Relations Authority (FLRA or Authority): *American Federation of Government Employees, AFL–CIO Local 199 and Army-Air Force Exchange Service, Dix-McGuire Exchange, Fort Dix, New Jersey* (hereinafter *Dix-McGuire*), 2 FLRA No. 16 (Nov. 29, 1979), and *American Federation of Government Employees, AFL–CIO and Air Force Logistics Command, Wright-Patterson Air Force Base, Ohio* (hereinafter *Wright-Patterson*), 2 FLRA No. 77 (Jan. 31, 1980). In No. 80–1119, *Dep't of Defense, Army-Air Force Exchange Service and Army-Air Force Exchange Service, Dix-McGuire Exchange, Fort Dix, N.J. v. FLRA*, petitioner (the agency) challenges a single ruling of nonnegotiability rendered by the FLRA in *Dix-McGuire*. The American Federation of Government Employees, AFL–CIO (AFGE or union) appears as an intervenor, arguing in support of the FLRA's decision below. Consolidated with No. 80–1119 in this decision are Nos. 80–1351 and 80–1358, both of which present challenges to negotiability determinations given in *Wright-Patterson*. In No. 80–1351, *Dep't of Defense et al. v. FLRA*, petitioners (the agency) challenge the Authority's decision that two union proposals were proper subjects of negotiation under the statute. AFGE is an intervenor, once again arguing in support of the FLRA rulings under review. In No. 80–1358, *AFGE, AFL–CIO v. FLRA*, it is the union that seeks our review of FLRA rulings that five

fused to bargain over various union proposals for the terms of collective bargaining agreements. The negotiability of each of the proposals was considered in the first instance by the Federal Labor Relations Authority (FLRA or Authority). The Authority held three of the contested proposals to be mandatory subjects of collective bargaining; it found five to be excluded from the statutory obligation to bargain under the terms of Section 7106. We affirm the Authority in each of its holdings.

I

Labor relations within the federal civil service are governed by Title VII of the Civil Service Reform Act of 1978. Because these cases are among the first under that statute, *see Nat'l Federation of Federal Employees v. FLRA*, 652 F.2d 191 (D.C.Cir. 1981); *American Federation of Gov't Employees v. FLRA*, 653 F.2d 669 (D.C.Cir. 1981), it might be useful to sketch the background against which we consider the issues presented.

A.

The questions before us arise on appeal from two decisions by the Federal Labor Relations Authority.[6] An independent agency within the Executive Branch,[7] the FLRA was established under Reorganization Plan No. 2 of 1978.[8] It was continued under and administers the labor relations section of the Civil Service Reform Act,

Title VII. Its role is analogous to that of the National Labor Relations Board under the National Labor Relations Act.[9] The Civil Service Reform Act invests the Authority with both rulemaking and adjudicatory powers.[10] Among its specific mandates, the FLRA possesses authority to determine appropriate units for labor organization and bargaining,[11] to conduct representation elections,[12] to adjudicate unfair labor practice complaints,[13] and to resolve exceptions to arbitrators' awards.[14] With only minor exceptions, final orders of the Authority are subject to review in the Courts of Appeals.[15] The Authority may petition any appropriate Court of Appeals for enforcement of its orders.[16]

The FLRA has assumed its role as a successor agency to the Federal Labor Relations Council. Functioning pursuant to Executive Order 11491,[17] issued by President Nixon in 1969, the Council was composed of three federal management officials: the Chairman of the Civil Service Commission, the Secretary of Labor, and the Director of the Office of Management and Budget. Its decisions were not subject to judicial review. The general framework for collective bargaining administered by the Council dated from 1962, the year in which Executive Order 10988,[18] issued by President Kennedy, initially established a program of labor-management negotiations for federal employees.

B.

The legislative history indicates that Title VII of the Civil Service Reform Act was

other *Wright-Patterson* proposals were nonnegotiable. The Department of Defense *et al.* appear as intervenors. The briefs for the various parties are hereinafter cited by reference to their docket numbers.

6. *See* note 5 *supra.*

7. *See* 5 U.S.C. § 7104.

8. 3 C.F.R. 323, 327 (1979), *reprinted in* 5 U.S.C. app. at 357, 359 (Supp. III 1979).

9. 29 U.S.C. § 151 *et seq.* (1976).

10. 5 U.S.C. § 7105.

11. 5 U.S.C. § 7105(a)(2)(A).

12. 5 U.S.C. § 7105(a)(2)(B).

13. 5 U.S.C. § 7105(a)(2)(G).

14. 5 U.S.C. § 7105(a)(2)(H).

15. 5 U.S.C. § 7123(a).

16. 5 U.S.C. § 7123(b).

17. 3 C.F.R. 861 (1966–1970 Compilation), *reprinted in* 5 U.S.C. § 7101 at 258 (Supp. III 1979).

18. 3 C.F.R. 521 (1959–1963 Compilation).

intended to serve a variety of purposes. Congress sought at least in part to strengthen the authority of federal management to hire and to discipline employees.[19] Representative Udall, who drafted the amendment that essentially became the labor relations chapter of the Reform Act, said explicitly that "one of the fundamental purposes of this bill is to make it easier and not harder to discharge incompetent employees * * *."[20] But the Reform Act also aimed to strengthen the position of employee unions in the federal service. The statutory statement of congressional purpose asserts that "protection of the right of employees to organize [and] bargain collectively" "safeguards the public interest," "contributes to the effective conduct of public business," and "facilitates and encourages the amicable settlements of disputes * * *."[21] Consistent with this view, the Reform Act replaced the Federal Labor Relations Council, which had been criticized as "defective" because its members "come exclusively from the ranks of management,"[22] with an independent and bipartisan FLRA. There was no suggestion that employee unions might not seek procedural protections against arbitrary or mistaken employee discharges. On the contrary, Representative Udall stressed that he intended his amendment "to meet some of the legitimate concerns of the Federal employee unions as an integral part of what is basically a bill to give management the power to manage and the flexibility that it needs."[23] Other members articulated nearly identical sentiments during the floor debates. Endorsing the Udall amendment, Representative Ford agreed that "while considering the increased powers for management, we always had in mind that we would put together a totality here * * * that we hoped would represent a fair package of balanced authority for management, balanced with a fair protection for at least the existing rights the employees have."[24]

The balance of statutory purposes is evidenced, not only in the legislative history, but in the text of the Reform Act. On the one side, Section 7106(a) purports to define certain reserved rights of management:

### § 7106. Management rights

(a) Subject to subsection (b) of this section, nothing in this chapter shall affect the authority of any management official of any agency—

(1) to determine the mission, budget, organization, number of employees, and internal security practices of the agency; and

(2) in accordance with applicable laws—

(A) to hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees;

(B) to assign work, to make determinations with respect to contracting out,

---

19. *See, e. g.,* H.R.Rep.No.95–1403, 95th Cong., 2d Sess. 4 (1978); S.Rep.No.95–969, 95th Cong., 2d Sess. 4 (1978). Although Title VII of the Reform Act was amended on the House floor to substitute language drafted by Representative Udall, *see* 124 Cong.Rec. H9653 (daily ed. Sept. 13, 1978), the Udall amendment, which was ultimately enacted into law, did not alter this basic aim. *See, e.g.,* 124 Cong.Rec. H9633 (daily ed. Sept. 13, 1978) (remarks of Rep. Udall) ("Major management rights to hire and fire and determine staffing are preserved in my amendment."); 124 Cong.Rec. S17083 (daily ed. Oct. 4, 1978) (remarks of Sen. Percy explaining House-Senate conference report accepting Udall amendment) ("At the core of the legislation, the conference agreed to provisions expediting and easing the process for disciplining and removing unfit Federal employees.").

20. 124 Cong.Rec. H9372 (daily ed. Sept. 11, 1978).

21. 5 U.S.C. § 7101.

22. Message from the President Transmitting Proposal to Reform the Federal Personnel Management System Through Reorganization Plan No. 2 of 1978, H.R.Doc.No.95–341, 95th Cong., 2d Sess. 2 (1978), *reprinted in* 5 U.S.C. app. 357, 360 (Supp. III 1979).

23. 124 Cong.Rec. H9633 (daily ed. Sept. 13, 1978).

24. 124 Cong.Rec. H9647 (daily ed. Sept. 13, 1978).

and to determine the personnel by which agency operations shall be conducted;

(C) with respect to filling positions, to make selections for appointments from—

(i) among properly ranked and certified candidates for promotion; or

(ii) any other appropriate source; and

(D) to take whatever actions may be necessary to carry out the agency mission during emergencies.[25]

It is agreed that a union proposal intruding on protected management rights is not a proper subject of collective bargaining under the Act.[26]

On the other side, the interest of employees in protecting their interests through collective bargaining is broadly recognized and protected. Federal management representatives are required to bargain in good faith over "conditions of employment"—a term that is expansively defined, subject only to express statutory exceptions, to include "personnel policies, and matters, whether established by rule, regulation, or otherwise, affecting working conditions * * *."[27] Even with regard to reserved management rights, the Act authorizes collective bargaining over the "procedures which management officials of the agency will observe in exercising [their] authority * * *."[28] Nor is the duty to bargain one that is lacking in practical effect. Although federal employees have no legal right to strike, management must make good faith efforts to reach agreement with employee representatives.[29] Where bargaining fails to produce an accord, the Act provides for binding arbitration by the Federal Service Impasses Panel,[30] or, if both parties agree and the procedure is approved by the Panel, by an outside arbitrator.[31]

■ The possibility of binding arbitration and imposed settlement lends importance to the question whether a union contract proposal is a mandatory subject of collective bargaining under the Reform Act.[32] Procedures for resolving this question are provid-

---

25. 5 U.S.C. § 7106(a).

26. Even the union implicitly concedes that this is so. *See* brief for intervenor AFGE, No. 80–1119, at 8 ("The broad right to collective bargaining, like private sector practice, does not extend to essential management prerogatives, commonly referred to as 'management rights.' ").

27. 5 U.S.C. § 7103(a)(14).

28. 5 U.S.C. § 7106(b)(2). Section 7106(a), the "management rights" section, is by its own terms "[s]ubject to subsection (b) * * *." 5 U.S.C. § 7106(a).

29. 5 U.S.C. § 7114(a)(4).

30. 5 U.S.C. §§ 7119(b)(1), 7119(c)(5)(B)(iii).

31. 5 U.S.C. § 7119(b)(2).

32. The Defense Department has stressed to this court that the Federal Service Impasses Panel frequently makes its arbitration decisions pursuant to a "final-offer selection" procedure. *See* reply brief for petitioners Department of Defense *et al.*, No. 80–1119, at 2–3. Under this procedure the Panel will not itself attempt to structure a compromise of conflicting aims or positions, but will choose between the "final offers" submitted by the parties. Thus, the Department argues, any proposal held negotiable by the FLRA may in fact be imposed on the parties by the Impasses Panel, which, it contends, has no authority to undertake an independent review of the conformity of the proposals before it with applicable law and regulations. *See id.*

Section 7117(c) of the Civil Service Reform Act expressly imposes on the FLRA a duty to determine the negotiability of disputed proposals properly brought before it. We therefore agree with the Defense Department that the FLRA must determine whether union proposals, as they are actually drafted, satisfy the negotiability standards of the statute—standards that include consistency with applicable law and regulations. 5 U.S.C. § 7117(a)(1). The Authority may not approve a proposal not presently consistent with law by invoking the theory that the proposal will subsequently be rendered legally acceptable either by the parties or by the Impasses Panel. But we do not understand the FLRA to argue otherwise. Moreover, because the issue is not presented by the facts of the case before us, we express no opinion on the statutory authority of the Impasses Panel to determine for itself the legality of a union proposal under applicable law or regulations.

ed by Section 7117 [33] and by regulations issued by the FLRA.[34]

Negotiability disputes characteristically arise when the union submits a proposal for inclusion in a collective bargaining agreement. If the agency believes that the proposal is contrary to law or applicable regulation, or is otherwise nonnegotiable under the statute, it may inform the union of its refusal to negotiate. Section 7117 thereupon provides a right to appeal the agency's determination of nonnegotiability to the FLRA.[35] The FLRA is required to decide the negotiability issue at the earliest possible date, issuing a written decision containing specific reasons for sustaining or setting aside the agency's allegation of nonnegotiability.[36] The FLRA's decision addresses only the negotiability of the union proposal under the Reform Act. It neither considers the merits of the proposal nor orders the agency to agree to it. If the proposal is found negotiable, the Authority holds only that the agency must bargain in good faith upon the union's request.

## II

The issues before us in these cases stem from FLRA decisions concerning the negotiability of eight union proposals. They come to us in three separate appeals, involving two decisions issued by the Authority, which this court has consolidated for review.[37]

**33.** 5 U.S.C. § 7117.

**34.** *See* 5 C.F.R. § 1414 (1980).

**35.** *See* 5 U.S.C. § 7117. If the union wishes to appeal, it first obtains a written allegation from the agency explaining its reasons for holding the proposal nonnegotiable. 5 C.F.R. § 2424.3 (1980). The union then files a petition seeking FLRA determination of the negotiability issue. 5 C.F.R. § 2424.4 (1980). The agency is served with a copy of this petition, to which it may respond with a statement setting forth reasons supporting its position. 5 C.F.R. § 2424.6(a)(2) (1980). The union then has a final right of rebuttal. 5 C.F.R. § 2424.7 (1980).

**36.** 5 U.S.C. § 7117(c)(6); *see* 5 C.F.R. § 2424.10 (1980). Although § 7117(b)(3) permits the Au-

### A. *No. 80–1119*, Dix-McGuire

No. 80–1119 comes before us on a petition filed by the Department of Defense. In the course of its contract negotiations with the Army-Air Force Exchange Service, Dix-McGuire Exchange, Fort Dix, New Jersey (the agency), the American Federation of Government Employees, AFL–CIO, Local 1999 (the union) advanced the following proposal as a basis for collective bargaining:

> In the event of a disciplinary suspension or removal, the grievant will exhaust the review provisions contained in this Agreement before the suspension or removal is effectuated, and the employee will remain in a pay status until a final determination is rendered.[38]

The agency responded that the proposal was nonnegotiable. If adopted, it said, the proposed contract term would "so unreasonably delay and impede the exercise of the reserved right to suspend and separate employees as to negate that right and, hence, violates . . . 5 U.S.C. 7106(a)(2)(A)." [39] The union appealed this determination to the Authority.

Rejecting the management claim, the FLRA held the procedure to be negotiable. The FLRA based its decision on Section 7106(b)(2), which provides that the enumeration of reserved management rights contained in Section 7106(a) "does not preclude the negotiation of procedures which management will observe in exercising those rights." [40] The Authority construed this section to license collective bargaining over

thority to hold a hearing before making a negotiability determination, none is ordinarily conducted. Brief for respondent FLRA, No. 80–1119, at 9 n.7.

**37.** *See* note 5 *supra*.

**38.** *Dix-McGuire, supra* note 5, at 1, *reprinted in* Joint Appendix in No. 80–1119 (hereinafter *Dix-McGuire* JA) at 29.

**39.** Brief for respondent FLRA, No. 80–1119, at 10 (*quoting* agency allegation of nonnegotiability filed with FLRA) (ellipsis in original).

**40.** *Dix-McGuire, supra* note 5, at 2, *Dix-McGuire* JA at 30.

proposed "procedures" for the exercise of management rights "except to the extent that * * * negotiations would prevent agency management from acting at all." [41] Although the arbitration process provided in the union proposal did not contain an express time limit, the FLRA found that the agency had failed to establish that its adoption would make it impossible for the agency to implement disciplinary actions.[42] The proposal was therefore negotiable under the "acting at all" standard adopted by the Authority.

### B. *No. 80–1351*, Wright-Patterson

There are two proposals at issue in No. 80–1351, brought before us by the Department of Defense. Like those presented for review in No. 80–1358, these proposals were submitted by the American Federation of Government Employees, AFL–CIO (the union) during contract negotiations between the union and the Air Force Logistics Command, Wright-Patterson Air Force Base, Ohio (the agency). The agency contended that a substantial number of the proposals would infringe protected management rights and therefore lay beyond the scope of the duty to bargain. Pursuant to 5 U.S.C. § 7117(c), the union appealed this allegation of nonnegotiability to the FLRA. Of the 16 proposals contested before the Authority, the FLRA held that eight were negotiable, that seven were not, and that one was partly negotiable and partly nonnegotiable.[43] The two proposals at issue in No. 80–1351 are union Proposals III and XIV, both of which were held negotiable by the FLRA.

Proposal III provides:

*Section 2. Details to Higher or Same Graded Positions*

B. Unless the employer decides to use competitive procedures as outlined in Article—(Promotions), temporary assignment to higher or same grade/different duty positions shall be offered to qualified and available employees with requisite skills on the basis of seniority within the lowest organizational segment. If senior employees decline and it is necessary to detail an employee, the least senior employee shall be assigned.[44]

In contesting the negotiability of the proposal the Defense Department argued that its adoption would infringe reserved management rights. According to the agency's construction, Section 7106(a)(2)(A) reserves a management right to make personnel assignments that may not be limited; management, it says, must retain full discretion to assign employees on any basis that it chooses.[45] The FLRA rejected this argument. The Authority recognized that the right to make assignments encompasses more than the narrow right to decide whether or not to assign that particular employee identified by some agreed set of procedures: "Under section 7106(a)(2)(A) of the Statute, the agency retains discretion as to the personnel requirements of the work of the position, *i. e.*, the qualifications and skills needed to do the work, as well as such job-related individual characteristics as judgment and reliability. Therefore, the right to assign an employee to a position includes the discretion to determine which employee will be assigned." [46] Nevertheless, the Authority found the union proposal to be negotiable. The reason lay in the proposal's authorization of competitive selection procedures.[47] As defined in the *Federal Personnel Manual*, competitive proce-

41. *Id.* at 4, *Dix-McGuire JA* at 31.

42. *Id.* at 4, *Dix-McGuire JA* at 32.

43. *Wright-Patterson, supra* note 5, *reprinted in* Joint Appendix in Nos. 80–1351 & 80–1358 (hereinafter *Wright-Patterson JA*) at 177.

44. *Id.* at 7, *Wright-Patterson JA* at 183.

45. *See* Department of Defense Statement of Position with Respect to the Negotiability of Certain Proposals Submitted by the American

Federation of Government Employees, AFL–CIO in Negotiations with the Air Force Logistics Command, Wright-Patterson Air Force Base, Ohio (May 17, 1979), at 8–25, *Wright-Patterson JA* at 19–27.

46. *Wright-Patterson, supra* note 5, at 10, *Wright-Patterson JA* at 186.

47. *Id.*

dures preserve "management's right to select or not select from among a group of best qualified candidates." [48] According to the FLRA, this reservation of management discretion brought the union proposal within the statutory duty to bargain: "Only if the agency chooses not to use competitive procedures must it select [an] individual on the basis of seniority. Because Union Proposal III preserves in this manner the agency's discretion to select, the proposal does not directly interfere with the agency's basic right to assign employees under section 7106(a)(2)(A) of the Statute." [49]

Union Proposal XIV dealt with temporary promotion to "encumbered" positions:

When an employee is temporarily assigned to an encumbered, but temporarily vacant[,] bargaining unit position of a higher grade for 30 days, the employee will receive the rate of pay for the higher position to which assigned, commencing on the 31st day.[50]

The agency challenged this proposal as incompatible with its right under Section 7106(b)(1) to determine "the numbers, types, and grades of employees or positions * * *." [51] The incompatibility arises, it argued, because an employee cannot be paid for a position unless he has actually been promoted to it. Because two persons cannot hold the same position, the agency could not temporarily pay an employee at a higher rate without either assigning him to an already vacant position or creating a new one; and requiring management to do this, the agency asserted, would violate its re-

served right to determine the number and grades of positions. The FLRA agreed with the agency that the law requires promotion as a prerequisite to increased pay. But the Authority found no barrier to temporary promotions of employees to encumbered but temporarily vacant positions.[52] It therefore concluded that the proposal could be implemented without the Air Force being required to create new positions.[53] Having rejected the agency's main objections, the Authority held Proposal XIV to be negotiable.

### C. *No. 80–1358*, Wright-Patterson

The five proposals underlying No. 80–1358 were presented by the American Federation of Government Employees, AFL–CIO (the union) during the same contract negotiations with the Air Force Logistics Command, Wright-Patterson Air Force Base, Ohio (the agency) as those involved in No. 80–1351. These, however, were held by the FLRA to be nonnegotiable, and it is the union that brings this appeal.

Union Proposals IV, V, VI, and VII would all require management to make certain employee assignments on the basis of seniority. Proposal IV would compel the agency to rotate "details" to lower grade positions among qualified and available employees in inverse order of seniority.[54] Proposal V, dealing with "loans" of employees to meet temporary or emergency needs outside their usual areas of employment, would similarly dictate selection of the least senior employees with requisite skills.[55] Proposal

---

**48.** *Federal Personnel Manual*, ch. 335, subch. 1–4, Requirement 4, *quoted in Wright-Patterson*, *supra* note 5, at 10 n.19, *Wright-Patterson* JA at 186 n.19.

**49.** *Wright-Patterson*, *supra* note 5, at 10, *Wright-Patterson* JA at 186.

**50.** *Id.* at 25, *Wright-Patterson* JA at 201.

**51.** 5 U.S.C. § 7106(b)(1).

**52.** *Wright-Patterson*, *supra* note 5, at 26 & n.54, *Wright-Patterson* JA at 202 & n.54.

**53.** *Id.* at 25–27, *Wright-Patterson* JA at 201–203.

**54.** Union Proposal IV states:

*Section 3. Details to Lower Graded Positions*
Details to lower grade positions will be rotated among qualified and available employees in inverse order of seniority.

*Id.* at 7, *Wright-Patterson* JA at 183.

**55.** The proposal states:

*Union Proposal V*
*Section 4. Loans*
B. Selection of employees for loans will be equitably rotated among qualified and available employees with requisite skills in inverse order of seniority.

*Id.* at 8, *Wright-Patterson* JA at 184.

VI mandates seniority as a selection criterion for temporary assignments outside the bargaining unit "[w]here conditions are less at the receiving location than is provided for by this contract * * *."[56] And Proposal VII would force the agency, in the absence of a volunteer for permanent reassignment from one duty station to another, to select the person to be assigned on an inverse seniority basis.[57]

The FLRA upheld the agency's claim of nonnegotiability with regard to each of these proposals. All, it concluded, infringed management rights to make personnel assignments protected under Section 7106(a). The crucial failure of Proposals IV, V, VI, and VII, in the Authority's view, lay in their elimination of agency "discretion" in making assignments.[58] "Discretion," it found, was "an essential part" of the package of rights reserved to management under Section 7106(a).[59] "In thus compelling the selection of a particular individual for * * * assignment," the FLRA held, Union Proposals IV, V, VI, and VII "each directly interfere[d] with" a reserved right of management.[60]

Union Proposal XIII specified procedures for determining certain personnel assignments following a reduction in force.[61] It would normally have required the agency to act on the basis of employee preferences. In rejecting the proposal as nonnegotiable the FLRA reiterated its view that "the right of the agency to assign employees includes discretion as to the selection of the particular employee to be assigned."[62] Because Proposal XIII eliminated such discretion, the Authority held it incompatible with the management rights reserved under Section 7106(a)(2)(A) and therefore outside the scope of the duty to bargain.

### III

The disputes at the core of these cases issue primarily from the contested relationship between Sections 7106(a) and 7106(b) of Title VII of the Civil Service Reform Act of 1978. In the case of each of the disputed union proposals, the management parties purport to identify some infringement of a management right protected under Section 7106(a). Again in each case, the union responds that Section 7106(a) states explicitly that its own terms are "subject to subsec-

---

**56.** The proposal states:

*Union Proposal VI*
*Section 5. Temporary Assignments Outside the Bargaining Unit*
B. Where conditions are less at the receiving location than is provided for by this contract, the employee's wishes to decline such assignment will be considered. Selection for such assignments will be equitably rotated in accordance with Section [3] of this Article.
*Id.* at 8, *Wright-Patterson* JA at 184.

**57.** The proposal states:

*Union Proposal VII*
ARTICLE 37 MISCELLANEOUS
*Section Mobility*
Prior to invoking the employment mobility requirement, the employer will seek volunteers from among employees of the same title, series and grade. If there are no volunteers, and the employer is required to unilaterally transfer employees within the unit, the employee with the least amount of seniority shall be selected first. The remaining employees shall be transferred in ascending seniority order.
*Id.* at 11, *Wright-Patterson* JA at 187.

**58.** *Id.* at 10, *Wright-Patterson* JA at 186.

**59.** *Id.*

**60.** *Id.*

**61.** Proposal XIII states:
*ARTICLE 16* REDUCTION IN FORCE
*Section 6.*
B. Prior to any placement actions, the employer will establish lists of positions by grade, title, series, career potential and location into which personnel may be entitled to bump or retreat. Lists will contain all vacant positions and will be updated weekly. These lists will be made available to all individuals determined to be affected by the RIF. All affected employees will be offered an opportunity to list the preferred positions desired in each grade, in order of preference. The employer will assign employees, in retention order, to positions of preference for which qualified, in the order of preference, unless there are persuasive mission related reasons for not doing so, in which case the employer will provide the reasons in writing to the union and to the employee.
*Id.* at 23–24, *Wright-Patterson* JA at 199–200.

**62.** *Id.* at 24, *Wright-Patterson* JA at 200.

tion (b) * * *." And subsection (b), Section 7106(b), clearly states: "Nothing in this section shall preclude any agency and any labor organization from negotiating * * * *procedures* which management officials of the agency will observe in exercising any authority under this section * * *."[63] Because its proposals are cast in procedural terms, the union finds them compulsory subjects of bargaining under the statute.

Analysis of the competing arguments must begin with the language of the statute itself. *See, e. g., Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976); *Zerilli v. Evening News Ass'n*, 628 F.2d 217 (D.C.Cir. 1980). Although that language possesses troubling ambiguities, it does, we think, make clear the intent of Congress, expressed in a distinction between negotiable procedures and management's nonnegotiable substantive authority. There are substantive rights reserved to management under Section 7106(a), subject to—but only to—*procedures* to be negotiated under Section 7106(b).

The difficulty arises, of course, because the distinction between procedure and substance is not always crisp.[64] Union proposals establishing "procedures" for employee selection illustrate the uncertain boundary between the categories. Selection on the basis of seniority, for example, defines a procedure for the exercise of management's

---

**63.** 5 U.S.C. § 7106(b)(2) (emphasis added).

**64.** The problematic character of this distinction is by no means unfamiliar to the federal courts, following judicial efforts to apply the dichotomy that was apparently mandated by the Supreme Court's landmark holding in *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Reversing the longstanding decision in *Swift v. Tyson*, 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842), *Erie* held: "Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State. * * * There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a State whether they be local in their nature or 'general,' * * *." 304 U.S. at 78, 58 S.Ct. at 822. Yet, as Justice Reed noted in dissent, "no one doubt[ed] federal power over procedure." *Id.* at 92, 58 S.Ct. at 828. The dichotomy between substance and procedure thus seemed not only complete but binding on the federal courts. *See* C. Wright, Handbook of the Law of Federal Courts 272 (3d ed. 1976).

As the courts quickly discovered, however, there are at least two difficulties in applying the distinction. The first is simply that "procedures" are not easily cabined, the realm of "substance" not easily protected from encroachment; for "almost every procedural rule may have a substantial effect on the outcome of a case." C. Wright, *supra*, at 256. This difficulty apparently caused the collapse of the Supreme Court's effort, begun in *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), to define as "substantive" any legal rule that might determine the outcome in a particular case. The outcome-determinative test simply had "no readily apparent stopping place * * *." Hart, *The Relations Between State and Federal Law*, 54 Colum.L. Rev. 489, 512 (1954). Yet, on the other side, lines of demarcation had to be drawn if there were to remain any nontrivial federal power to establish judicial "procedures." The second problem, as Justice Frankfurter pointed out in *Guaranty Trust, supra*, is that the impossibility of drawing a clear bright line between substance and procedure leads to a predictable confusion: " '[S]ubstance' and 'procedure' are the same key-words to very different problems. Neither 'substance' nor 'procedure' represents the same invariants. Each implies different variables depending upon the particular problem for which it is used." 326 U.S. at 108, 65 S.Ct. at 1469, *see Hanna v. Plumer*, 380 U.S. 460, 471, 85 S.Ct. 1136, 1143, 14 L.Ed.2d 8 (1965) ("The line between 'substance' and 'procedure' shifts as the legal context changes.").

More recent Supreme Court cases have substantially redefined the so-called "*Erie* doctrine," and it is now clear that no simple litmus test will determine which "procedural" issues are governed by state and which by federal law. C. Wright, *supra*, at 272; *see, e. g., Byrd v. Blue Ridge Rural Electric Cooperative, Inc.*, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958) (federal policies concerning governance of courts properly weighed in determining whether to apply state or federal rules); *Hanna v. Plumer, supra*, 380 U.S. at 469–470, 85 S.Ct. at 1142–1143 (correcting "the incorrect assumption that the rule of *Erie R. Co. v. Tompkins* constitutes the appropriate test of the validity and therefore the applicability of a Federal Rule of Civil Procedure"). Nonetheless, courts and lawyers continue to talk in terms of a distinction between substance and procedure, and they continue to make important decisions turn upon it. For an exploration of some of the many aspects of the interrelationship between substance and procedure, *see generally* R. Cover & O. Fiss, The Structure of Procedure (1979).

right to hire or promote. But it is equally true that a proposal requiring selection based on seniority both establishes the substantive criterion pursuant to which selection will occur and identifies the particular employee to be chosen. Unless procedure is to be permitted to swallow substance entirely, it therefore becomes necessary to inquire into the range of proposals to be deemed "procedural" within the contemplation of the statute.

The need for an interpretive standard of this kind accounts for the various formulae enunciated by the FLRA and for those urged by the parties on this court. In *Dix-McGuire*, No. 80–1119, the Authority held that proposals structured in procedural language would be negotiable unless the effect of their adoption would be to stop management from "acting at all." [65] In so doing it rejected the argument of the agency, which proposed to draw a different line between procedure and substance. The agency suggested that a proposal ceased to be procedural within the intent of the law if it was of such a character as to "unreasonably delay" management action.[66] In the *Wright-Patterson* cases the FLRA again undertook to draw a line between proposals that are properly procedural within the meaning of the statute and those that impinge on substantive agency authority. The Authority held in these cases that various proposals advanced by the union were not negotiable, despite their being expressed in procedural terms, because their adoption would "directly interfere" [67] with reserved management rights to make decisions of substance. The union now contests this standard, insisting on the propriety of the "acting at all" test propounded by the Authority in *Dix-McGuire*. It also argues that the Authority erred in applying different standards in the two cases.[68]

Despite the inherent ambiguities of the distinction between procedure and substance, and the attendant difficulties in its application, the intent of Congress cannot be ignored. It is the task of the FLRA, authorized by statute to "provide leadership" in implementing the labor-management chapter of the Civil Service Reform Act,[69] to develop workable standards consistent with the Act's underlying policies and intent.

In this regard, we think it appropriate to note what we perceive as a difference in kind among the cases calling for application of the statutory distinction between negotiable procedures and reserved substantive rights. There are, on the one hand, cases in which proposals cast in procedural language impinge on substantive management decisions by specifying the criteria pursuant to which decisions must be made. There are, on the other, more nearly "pure" procedures, which have less direct substantive repercussions—for example, procedures for use in determining which employees possess characteristics identified by management as appropriate criteria for choice. In view of this difference, we proceed to our discussion and decision of these consolidated cases without assuming beforehand that a standard found appropriate for one of these classes must also be applied to the other.

## IV

### A. No. 80–1119, Dix-McGuire

■ The sole negotiability issue in *Dix-McGuire* involves a proposed union contract term under which no employee could be removed or suspended from his job until completion of the review procedures provided under a collective bargaining agreement.

---

65. *Dix-McGuire, supra* note 5, at 3, *Dix-McGuire* JA at 31.

66. *See id.* at 2–3, *Dix-McGuire* JA at 30–31.

67. *Wright-Patterson, supra* note 5, at 10, *Wright-Patterson* JA at 186.

68. *See* brief for petitioner AFGE, No. 80–1358, at 11.

69. Section 7105(a)(1) of the Act, 5 U.S.C. § 7105(a)(1), provides:

The Authority shall provide leadership in establishing policies and guidance relating to matters under this chapter, and, except as otherwise provided, shall be responsible for carrying out the purpose of this chapter.

Management objected that the proposal invited procedural delays incompatible with its reserved authority under Section 7106(a). Overruling this objection, the FLRA upheld the negotiability of the proposal.

As the FLRA recognized, the plain language of the statute strongly supports the union's position. Although Section 7106(a) asserts that nothing in the Reform Act "shall affect the authority of any management official" to hire, and take disciplinary action, it *also* provides that the terms of subsection (a) are "[s]*ubject to subsection (b)* * * *."[70] And subsection (b) clearly states that "[n]othing in this *section*"—which *includes* subsection (a), on which management's argument is based—"shall preclude any agency and any labor organization from negotiating * * * procedures which management officials of the agency will observe in exercising any authority under this section * * *."[71] The language of Section 7106 thus seems to establish a hierarchy, in which the terms of subsection (b) hold priority over those of subsection (a). And the union proposal in this case, involving procedures to be followed prior to the exercise of management's right to discharge and discipline employees, appears to fall plainly within the language of Section 7106(b).

Before affirming this conclusion, however, we—like the FLRA—must take account of the management claim that the proposal in this case was not properly "procedural" within the meaning of the statute, because the effect of its adoption would be to "eviscerate" management rights enumerated in Section 7106(a). The FLRA weighed this argument, but concluded that this threatened effect would not occur. "[T]he procedural requirement established by the proposal," the Authority held, "relates only to *when* the suspension or removal may be effectuated, not to whether the agency ultimately will be able to implement those actions."[72] The mere possibility of delay would not take a proposal outside the statutory obligation to negotiate. The test of negotiability, the FLRA held, was whether a union proposal would, if adopted, prevent agency management from "acting at all."[73]

In its brief in this court the agency rests its claim for reversal of the FLRA's decision largely on an attack on this asserted rule of decision: the holding that procedural proposals are negotiable under the statute unless their adoption would stop the agency from "acting at all." In the context of this case—one involving a procedural proposal that does not directly mandate substantive criteria pursuant to which management must act—we find the attack to be unconvincing.

We note at the outset that the "acting at all" standard is a reasonable and natural construction of the statutory language, rendered by the agency given responsibility for administering the statute[74]: The management power to act that is protected by Section 7106(a) may be limited by procedures under Section 7106(b), but only so far as the procedures do not have the effect of eliminating management authority by preventing its "acting at all."

---

**70.** 5 U.S.C. § 7106(a) (emphasis added). Section 7106(a) is quoted in its entirety in text at note 25 *supra.*

**71.** 5 U.S.C. § 7106(b)(2) (emphasis added).

**72.** *Dix-McGuire, supra* note 5, at 4, *Dix-McGuire* JA at 32 (emphasis in original).

**73.** *Id.* at 3, *Dix-McGuire* JA at 31.

**74.** We are not unmindful that deference by a court to an agency's determination is particularly appropriate "when the administrative practice at stake 'involves a contemporaneous construction of a statute by the [persons] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.'" *Power Reactor Development Co. v. Int'l Union of Elec., Radio & Machine Wkrs.* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961), *quoting Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933); *see also Nat'l Federation of Federal Employees v. FLRA,* 652 F.2d 191, 193 (D.C.Cir.1981); *Haviland v. Butz,* 543 F.2d 169, 174 (D.C.Cir. 1976).

Moreover, the "acting at all" standard finds support in—even if it is not necessarily mandated by—the legislative history. In this regard it stands in marked contrast with the alternative standard advanced by the management parties, who contend that a proposal should be held nonnegotiable if its adoption might occasion "unreasonable delay" in the exercise of management rights.

In its opinion below the FLRA justified its adoption of the "acting at all" standard largely by citation to a single passage in the report of the House-Senate conference committee that reported Title VII of the Civil Service Reform Act in the form in which it became law.[75] In their briefs in this court the parties again treat this passage as central. It bears quotation in full:

> 3. [Proposed] Senate section 7218(b) provides that negotiations on procedures governing the exercise of authority reserved to management shall not *unreasonably delay* the exercise by management of its authority to act on such matters. Any negotiations on procedures governing matters otherwise reserved to agency discretion by subsection (a) may not have the effect of actually negating the authority as reserved to the agency by subsection (a). There are no comparable House provisions.
>
> *The conference report deletes these provisions. However, the conferees wish to emphasize that negotiations on such procedures should not be conducted in a way that prevents the agency from acting at all, or in a way that prevents the exclusive representative from negotiating fully on procedures.* * * * [76]

In our view, analysis restricted to this text alone reveals an inescapable ambiguity. The agency contends that the conference intended the "acting at all" standard to be applied to bar *negotiations* so protracted as to prevent management action; the substantive negotiability of union proposals, it says, should be judged against a standard of whether their *adoption* might cause the exercise of management rights to be unreasonably delayed. The FLRA, on the other hand, argues that the conference intended the "acting at all" test to apply to proposed contract provisions as well, as the ultimate measure of their negotiability under the statute.

Although the quoted passage is ambiguous at best, we believe that the legislative history, taken as a whole, gives stronger support to the view of the FLRA than to that of the agency. We reach this conclusion after review of the legislative approaches to the body of case law that had grown up under the FLRA's predecessor agency, the Federal Labor Relations Council. Prior to the passage of the Civil Service Reform Act, collective bargaining between employees and the federal agencies was governed by Executive Order. Like Section 7106(a) of the Reform Act, Section

**75.** *See Dix-McGuire, supra* note 5, at 2–3, *Dix-McGuire* JA at 30–31.

**76.** Joint Explanatory Statement of the Committee on Conference, H.R.Rep.No.95–1717, 95th Cong., 2d Sess. 158 (1978), *quoted in Dix-McGuire, supra* note 5, at 3 n.5, *Dix-McGuire,* JA at 31 n.5. Section 7218 of the Senate bill, to which the quoted passage refers, provided in pertinent part:

> (b) Nothing in subsection (a) of this section shall preclude the parties from negotiating—
>
> (1) procedures which management will observe in exercising its authority to decide or act in matters reserved under such subsection; or
>
> (2) appropriate arrangements for employees adversely affected by the impact of management's exercising its authority to decide or act in matters reserved under such subsection,
>
> except that such negotiations shall not unreasonably delay the exercise by management of its authority to decide or act, and such procedures and arrangements shall be consistent with the provisions of any law or regulation described in 7215(c) of this title, and shall not have the effect of negating the authority reserved under subsection (a).

*Report of the Committee on Governmental Affairs of the United States Senate to Accompany S. 2640,* S.Rep.No.95–969, 95th Cong., 2d Sess. 140, 212 (1978). S. 2640 was passed by the Senate, without relevant amendment, on August 24, 1978. 124 Cong.Rec. S14324 (daily ed. Aug. 24, 1978).

12(b) of Executive Order 11491 established certain management rights not subject to bargaining.[77] Regarding Section 12(b), the Council's interpretive principle was clear. In a series of cases beginning with *Local 63, American Federation of Government Employees, AFL–CIO, and Blaine Air Force Station, Blaine, Washington* (*Blaine*), 3 FLRC 75 (1975), the Council held union bargaining proposals to be nonnegotiable if they contained procedures that would "unreasonably delay" the exercise of reserved management rights.[78]

As Congress began its deliberations over proposals to enact civil service reform legislation, the status of the existing case law became a focus of concern. The Carter Administration drafted proposed statutory language that would have placed the "provisions, policies and approaches of Executive Order 11491" into law,[79] and the Senate Committee on Governmental Affairs and then the Senate as a whole retained the Administration language in Section 7218 of the Senate bill. This language—the very language that the conference committee decided to delete—was explained as follows by the Committee on Governmental Affairs:

[I]t is specified in subsection [7218(b)] that nothing in that subsection shall preclude parties from negotiating procedures which management will observe in exercising its authority to decide or act or from negotiating arrangements for employees adversely affected provided that such negotiations do not result in certain consequences and are consonant with law and regulations * * *. These principles with respect to the obligation to negotiate "procedures" and "impact," while not expressly stated in Executive Order 11491, are established in case law thereunder.[80]

As illustrated by the reference to the "case law," the Senate bill clearly intended to adopt the *Blaine* principle that negotiation would not be permitted—that a proposal would be deemed nonnegotiable—if it might produce "certain [unacceptable] consequences," such as adoption of procedures resulting in unreasonable delay.

The House of Representatives dealt very differently with the Administration proposal to import the "unreasonable delay" standard into the new law. In the House "man-

---

**77.** Unlike § 7106(a), however, § 12(b) did not purport to make reserved management rights "subject to" negotiable procedures. The pertinent language of § 12(b) provided:

> Sec. 12. *Basic provisions of agreements.* Each agreement between an agency and a labor organization is subject to the following requirements—
>
> \* \* \* \* \* \*
>
> (b) management officials of the agency retain the right, in accordance with applicable laws and regulations—
>
> \* \* \* \* \* \*
>
> (2) to hire, promote, transfer, assign, and retain employees in positions within the agency, and to suspend, demote, discharge, or take other disciplinary action against employees[.]

3 C.F.R. 869–870 (1966–1970 Compilation), *reprinted in* 5 U.S.C. app. at 258, 261 (Supp. III 1979).

**78.** *See Nat'l Treasury Employees Union and Bureau of Alcohol, Tobacco & Firearms, Dep't of the Treasury*, 6 FLRC 176 (1978); *Nat'l Treasury Employees Union, Chapter 101, and U. S. Customs Service, Office of Regulation & Rul-*

ings, 6 FLRC 986 (1978); *American Federation of Gov't Employees, Local 3632, and Corpus Christi Army Depot*, 6 FLRC 1071 (1978).

These cases represented an extension of the principles underlying *Veterans Administration Independent Service Employees Union and Veterans Administration Research Hospital, Chicago, Illinois*, 1 FLRC 227, 230 (1972), in which the Council held that § 12(b) permitted "negotiations of procedures * * * which management will observe in [exercising § 12(b) rights], provided that such procedures do not have the effect of negating the authority reserved." In the cases in the *Blaine* line the Council found bargaining proposals nonnegotiable on the theory that they contained procedures that would so unreasonably delay the exercise of management's right to act under § 12(b) as to negate that right.

**79.** Letter from Alan K. Campbell, Chairman, Civil Service Commission, and James T. McIntyre, Jr., Director, Office of Management and Budget, to Senator Ribicoff, transmitting Administration Amendment No. 2084 to S. 2640, 124 Cong.Rec. S7469 (daily ed. May 15, 1978).

**80.** S.Rep.No.95–969, 95th Cong., 2d Sess. 109 (1978).

agement rights" provisions that reflected the Administration position were called to votes on at least two occasions, once in the Committee on Post Office and Civil Service[81] and once on the House floor.[82] They were rejected in both instances. The relevant language that ultimately was adopted by the House—the exact language now contained in Section 7106 of the Civil Service Reform Act—was offered in a floor amendment by Representative Udall.[83] In an accompanying Sectional Analysis he explained the Section 7106 relationship between reserved rights and negotiable procedures in these terms:

This substitute strengthens the "Management rights" section reported by the Committee, but it is *still to be treated narrowly as an exception to the general obligation to bargain over conditions of employment.*

* * * [M]anagement has reserved the right to make the final decision to "remove" an employee, but that decision must be made *in accordance with applicable laws and procedures, and the provisions of any applicable collective bargaining agreement.* The reserved management right to "remove" would in no way affect the employee's right to appeal the decision through statutory procedures or, if applicable, through the procedures set

forth in a collective bargaining agreement.[84]

Two facts about this statement deserve comment. First, Representative Udall obviously contemplated negotiation over disciplinary procedures, such as those at issue in No. 80–1119. Second, the Udall amendment made no reference to "unreasonable delay." Indeed, Representative Udall actively opposed unsuccessful amendments that would have retained this legal standard.[85]

The House-Senate conference committee adopted the House version of Section 7106 —the version introduced by Representative Udall—without revisions.[86] It is on the report of that committee, quoted above, that the parties principally rely for evidence of congressional intent.

As noted, the management parties argue that the FLRA has misread the conference report. They contend that the deleted Senate provision and the explanatory language of the committee addressed "the issue of the time consumed in negotiations, not the time necessary to complete the negotiated procedures once the procedures are agreed upon."[87] In the context of the full legislative history, however, this view of the committee report is hard to accept. The antecedent legislative debate had clearly fo-

81. Before beginning markup on H.R. 11280, the Democratic members of the Post Office and Civil Service Committee met in caucus. *See* 124 Cong.Rec. H5248 (daily ed. June 9, 1978). Following that meeting the committee used language drafted by Chairman Clay and Representatives Ford and Solarz as the working text from which it refined most of the labor-management provisions of the committee bill. *See* H.R.Rep.No.95–1403, on H.R.11280, 95th Cong., 2d Sess. 400 (1978) (supplemental views); 124 Cong.Rec. H8467 (daily ed. Aug. 11, 1978). Following this implicit rejection of the Administration language and purposes, an Administration draft was explicitly offered as an amendment to the Clay-Ford-Solarz text. It was rejected by the committee on a vote of 9–16. 124 Cong.Rec. E4497 (daily ed. Aug. 10, 1978).

82. On September 13, 1978 Representative John Collins introduced an amendment that was identical to the Senate bill in both its enumeration of management rights and its restrictions on negotiable procedures. *See* 124 Cong.Rec.

H9621–H9622, H9624 (daily ed. Sept. 13, 1978). The Collins amendment was defeated by voice vote. *Id.* at H9653.

83. *See* 124 Cong.Rec. H9627 (daily ed. Sept. 13, 1978) (§ 7106).

84. 124 Cong.Rec. H9634 (daily ed. Sept. 13, 1978) (emphasis added).

85. *See* 124 Cong.Rec. H9458 (daily ed. Sept. 11, 1978) (remarks of Rep. Udall) (opposing Erlenborn amendment); 124 Cong.Rec. H9633 (daily ed. Sept. 13, 1978) (remarks of Rep. Udall) (offering Udall amendment as substitute for Collins amendment).

86. *See* Joint Explanatory Statement of the Committee on Conference, H.R.Rep.No.95–1717, 95th Cong., 2d Sess. 158 (1978).

87. Brief for petitioners Department of Defense *et al.*, No. 80–1119, at 24.

cused, not on the threat of protracted negotiations, but on the *kinds* of proposals that ought and ought not to be negotiable. Despite being invited to do so, the House had explicitly declined to accept language adopting an "unreasonable delay" standard for determining the negotiability of union proposals. And the Senate, which had earlier opted for that standard, agreed to deletion of the pertinent language by the House-Senate conference. It was that Senate agreement that the disputed language of the conference report sought to explain. Under the circumstances, we cannot say that the FLRA misconstrued the conference report in deriving its "acting at all" test of negotiable procedures under Section 7106.

■ The agency advances other arguments why this court should reject the "acting at all" standard enunciated by the FLRA. For example, the agency argues that it is implausible to think that Congress would pass a law countenancing, not merely delay, but "unreasonable delay," in implementation of management decisions.[88] In the context, however, its argument is unconvincing. As the FLRA has emphasized, a negotiability standard is used only to determine whether a proposal is a proper subject of bargaining, not whether it ought to

be implemented on the merits.[89] In collective bargaining, government managers are presumably competent to look out for government interests. Congress has clearly acted on this premise in the enactment of other legislation, such as the labor-management chapter of the Foreign Service Act of 1980.[90] Indeed, in reporting Section 1005 of the Foreign Service Act,[91] a management rights provision that was modeled after Section 7106 of the Civil Service Reform Act,[92] the House-Senate conference not only urged adoption of an "acting at all" standard; it cited Section 7106 of the Civil Service Reform Act as precedent for its decision to do so:

> [W]ith respect to negotiated procedures the [House and Senate] bills are consistent and reflect the conference report to accompany the Civil Service Reform Act of 1978 (S.Rept. 95–1271, p. 158), which stated that *the standard for determining whether a proposal is nonnegotiable is whether it "prevent[s] the agency from acting at all.* * * * [93]

The conference report was "agreed to" by both the full Senate and the full House.[94]

The agency also offers arguments that the FLRA's "acting at all" standard must

**88.** *See id.* at 17–19.

**89.** The FLRA's *Dix-McGuire* opinion said explicitly, "In * * * deciding that the subject proposal is within the duty to bargain, the Authority makes no judgment as to the merits of the proposal." *Dix-McGuire, supra* note 5, at 2 n.3, *Dix-McGuire* JA at 30 n.3.

**90.** Pub.L.No.96–465, 94 Stat. 2071 (1980).

**91.** 22 U.S.C.A. § 4105 (1981 Pocket Part).

**92.** *See* H.R.Rep.No.96–1432, 96th Cong., 2d Sess. 117 (1980), *reprinted in* [1980] U.S.Code Cong. & Ad.News 4419, 4543, 4551 ("The chapter 10 provisions resulted from an amendment adopted in subcommittee in the House which was modeled after title VII of the Civil Service Reform Act of 1978.").

**93.** *Id.,* (emphasis added; last brackets in original).

**94.** *See* 126 Cong.Rec. S13871 (daily ed. Sept. 30, 1980) (Senate agreement); 126 Cong.Rec. H10238 (daily ed. Oct. 1, 1980) (House agree-

ment). Although we have also considered this legislative history as relevant evidence of the intent of the Congress that passed § 7106 of the Civil Service Reform Act, *see, e.g., Andrus v. Shell Oil Co.,* 446 U.S. 657, 666 n.8, 100 S.Ct. 1932, 1938 n.8, 64 L.Ed.2d 593 (1980); *Glidden v. Zdanok,* 370 U.S. 530, 541–542, 82 S.Ct. 1459, 1468–1469, 8 L.Ed.2d 671 (1963) (opinion of Harlan, J., in which Brennan and Stewart, JJ., joined), we recognize that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 117, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980), *quoting United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960), *quoted in United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 348–349, 83 S.Ct. 1715, 1733–1734, 10 L.Ed.2d 915 (1963). Thus, while we have weighed this information in upholding the FLRA's "acting at all" standard, we have certainly not regarded it as dispositive of the question of congressional intent, or indeed treated it as an especially important factor in our deliberations.

be rejected as inconsistent with other provisions of the Reform Act. These claims do not require prolonged discussion.

The agency contends that toleration of lengthy delays prior to management removal of employees would be inconsistent with the statutory authority of management to "take whatever actions may be necessary to carry out the agency mission during emergencies."[95] This argument is misdirected. The proposal under review deals only with *disciplinary* suspensions and removals. It does not necessarily apply to emergency assignments, even for disciplinary reasons.

■ The agency similarly argues that toleration of delays is inconsistent with the statutory command that any "negotiated grievance procedure * * * shall provide for expeditious processing * * *."[96] This provision may, indeed, place some limit on the kind of grievance procedures to which the parties could agree.[97] But management has not shown that arbitration is so slow as to run afoul of this standard, and the FLRA was not required to conclude otherwise. The characteristic speed of arbitral dispute resolution[98] also refutes the argument that the union's proposal in this case tolerates indefinite delay and thus should be declared nonnegotiable as impairing management's reserved authority even under the FLRA's "acting at all" standard.

■ Finally, the agency lodges an objection that the FLRA failed to consider relevant factors before reaching its challenged decision. This claim rests principally upon 5 U.S.C. § 7135(b), which states in pertinent part that "decisions issued under Executive Order[ ] 11491 * * * shall remain in full force and effect * * * unless superseded by specific provisions of this chapter or by regulations or decisions issued pursuant to this chapter." As construed by the agency, Section 7135(b) establishes that the decisions of the Federal Labor Relations Council—including those holding union proposals nonnegotiable under an "unreasonable delay" standard[99]—were due substantial deference from the FLRA. At a minimum, the agency says, the FLRA was required to explain its departure from Council precedents.

Our review of the legislative history should make obvious the weakness of this argument. The language of Section 7106 differs in important and relevant aspects from that of the parallel Section 12(b) of Executive Order 11491.[100] Moreover, in opting for the new language the House and then the Senate-House conference explicitly rejected alternative proposals that would have retained the interpretive standards of the existing case law.[101] Under the circumstances, it is apparent that the Council decisions to which the agency appeals were "superseded by specific provisions of this chapter" within the meaning of Section 7135(b).

**95.** 5 U.S.C. § 7106(a)(2)(D).

**96.** 5 U.S.C. § 7121(b)(2).

**97.** In this connection, we note that the FLRA has broad rulemaking and interpretive powers, which it might profitably use to define the time limits that must be satisfied for dispute resolution proposals to be negotiable under Title VII of the Civil Service Reform Act.

**98.** The very nature of arbitration tends to promote expeditious resolutions of disputes. *Boys Markets, Inc. v. Retail Clerks Union Local 770,* 398 U.S. 235, 240, 90 S.Ct. 1583, 1586, 26 L.Ed.2d 199 (1970). It is for this reason that arbitration is so widely favored in both public and private sector labor relations. F. Elkouri & E. Elkouri, How Arbitration Works 7, 10–12 (1970 ed.).

**99.** *See, e.g., Local 63, American Federation of Gov't Employees, AFL–CIO, and Blaine Air Force Station, Blaine, Washington,* 3 FLRC 75 (1975); *Nat'l Treasury Employees Union and Bureau of Alcohol, Tobacco & Firearms, Dep't of the Treasury,* 6 FLRC 178 (1978); *Nat'l Treasury Employees Union, Chapter 101, and U.S. Customs Service, Office of Regulations and Rulings,* 6 FLRC 986 (1978); *American Federation of Gov't Employees, Local 3632, and Corpus Christi Army Depot,* 6 FLRC 1071 (1978).

**100.** Most obviously and importantly, § 12(b) did not include language expressly making the exercise of management rights "subject to" negotiable procedures. *See* note 77 *supra* (*quoting* pertinent language from § 12(b)).

**101.** *See* notes 76–94 *supra* and accompanying text.

B. *Nos. 80–1351 and 80–1358*, Wright-Patterson

Five of the seven union proposals at issue in Nos. 80–1351 and 80–1358 involve procedures that would have conditioned certain job assignments at least partly on an employee's seniority. These proposals obviously implicate substantive concerns. They identify a substantive criterion—namely, length of employment—on the basis of which personnel assignments would be made.

■ In weighing the negotiability of these proposals under Section 7106 the FLRA applied what the parties have characterized in this court as a "direct interference" test. Under this standard, as explicated by the Authority, a proposal for employee selection procedures would be held nonnegotiable if its implementation would "directly interfere with the agency's basic right to assign employees [as reserved] under section 7106(a)(2)(A) * * *." [102] This is of course a different test of negotiability from the "acting at all" standard articulated by the Authority in *Dix-McGuire*, and the union has suggested here that this alleged inconsistency must be corrected.[103]

We find no necessary incompatibility between the two approaches. Proposals to establish seniority as a basis for personnel assignments stand close to the uncertain border between procedure and substance.[104] Such proposals are therefore different in kind from that involved in *Dix-McGuire*—a proposal that did not specify the criteria on which disciplinary action should be based, but only designated procedures for determining whether management criteria had in fact been satisfied in a particular instance. In view of the difference between the kinds of proposals under review, we

cannot agree that an identical standard must be applied to both. Rejecting the challenge based on this point, we find no need to address the FLRA's contention in this court that application of the "acting at all" standard would have yielded the same results as those obtained under the "direct interference" formula.[105]

■ In developing and applying the "direct interference" test, the FLRA appears to have reasoned from the premise that "[t]he right to assign employees in the agency under section 7106(a)(2)(A) of the Statute is more than merely the right to decide [whether] to assign an employee" [106] after that employee has been identified by negotiable standards as uniquely eligible for the assignment. Management, in other words, must retain more than a right to say yes or no to an employee who is identified for assignment under selection standards negotiated with a union.

The union vigorously disputes this premise. It argues that "the authority to assign in [Section] (a)(2)(A) means just what the plain language states, and nothing more: the authority to assign—the legal entitlement to take an official personnel action." [107] Because decisions about selection criteria do not effect any legal change in an employee's status, the union argues, they do not constitute "personnel action" within management's reserved authority.[108]

■ The union's constrictively literalist construction of Section 7106(a) would permit collective bargaining over literally all personnel qualifications, no matter how essential to successful job performance, and would allow contractual requirements of selection based on a scaled ranking. We find this interpretation to be unsupportable. It

102. *Wright-Patterson, supra* note 5, at 20, *Wright-Patterson* JA at 186.

103. *See* brief for petitioner AFGE, No. 80–1358, at 20–25, 55–56.

104. *See* note 64 *supra* and accompanying text.

105. *See* brief for respondents Department of Defense *et al.*, Nos. 80–1351 and 80–1358, at 44.

106. *Wright-Patterson, supra* note 5, at 10, *Wright-Patterson* JA at 186.

107. Brief for petitioner AFGE, No. 80–1358, at 19.

108. *Id.*

ignores repeated assertions in the legislative history that Congress aimed to create a "balanced" statute [109] that would, in the words of Representative Udall, the leading framer of Title VII, "give management the power to manage and the flexibility that it needs." [110] Indeed, the union view would so thoroughly subordinate Section 7106(a) to Section 7106(b) as to read the former effectively out of the statute. Familiar canons of interpretation thus counsel rejection of the union's position. We must attempt to read the statute in a "manner which effectuates rather than frustrates the major purpose of the legislative draftsmen." *Shultz v. Louisiana Trailer Sales, Inc.*, 428 F.2d 61, 65 (5th Cir. 1970); *see Equal Employment Opportunity Comm'n v. Louisville & Nashville R. Co.*, 505 F.2d 610, 616–617 (5th Cir. 1974). Further, where alternative interpretations are possible, we should attempt to give effect to every word that Congress used. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979).

■ The Authority's construction of the statutory language, and its application of that construction to the proposals before it, accord far better with the teaching of these canons. Lacking clear guidance in the statutory language, the FLRA reasoned, consistent with the statute's purpose and its legislative history, that the right to establish personnel standards and qualifications

was implicit in the reserved management right to make assignments: "An agency chooses to assign an employee to a position so that the work of that position will be done. Under section 7106(a)(2)(A) of the Statute, the agency retains discretion as to the personnel requirements of the work of the position * * *." [111] And these requirements, the FLRA continued, must be determined not on a general but on an individual basis. The agency, it held, must be able to decide whether a particular employee being considered for assignment has such "job-related individual characteristics as judgment and reliability." [112] "Therefore," the Authority concluded, "the right to assign an employee to a position includes the discretion to determine which employee will be assigned." [113]

The FLRA's decisions on the seniority proposals before it followed logically from its determination that Section 7106(a) protected the agency's right to exercise discretion at the conclusion of procedures to test and quantify employee qualifications. Union Proposals IV, V, VI, and VII would each have compelled selection of a particular individual, based on seniority, at least in some instances. Once the agency had "determined the particular qualifications and skills needed to perform the work of the position to which the employee will be assigned, and identified the employees in the unit who meet those requirements and would be available for assignment, selection

---

109. *See, e.g.,* 124 Cong.Rec. H9633 (daily ed. Sept. 13, 1978) (remarks of Rep. Udall) ("[Section 7106] gives some balance. We are saying to the Federal employees that we are going to give management some broad new rights * *. And employee organizations are saying, in turn, that they are entitled to have a more independent, secure position from which to deal with management * * *."); 124 Cong.Rec. H9647 (daily ed. Sept. 13, 1978) (remarks of Rep. Ford) ("[W]hile considering the increased powers for management, we always had in mind that we would put together a totality here * * * that we hoped would represent a fair package of balanced authority for management, balanced with a fair protection for at least the existing rights the employees have."); 124 Cong.Rec. S17083 (daily ed. Oct. 4, 1978) (statement of Sen. Sasser) (the conference report "establishes a responsible and balanced system of labor-management relations for Fed-

eral employees" and helps to create "a civil service system that truly serves the American public while offering necessary protections to [civil servants]"); *id.* (remarks of Sen. Percy) (the federal labor-management relations chapter "represents a fair balance between the rights of employees to form and participate in bargaining units * * * and the need of the Government to maintain the efficiency of its operations.").

110. 124 Cong.Rec. H9633 (daily ed. Sept. 13, 1978).

111. *Wright-Patterson, supra* note 5, at 10, *Wright-Patterson* JA at 186.

112. *Id.*

113. *Id.*

from among the employees so identified of the particular employee who will be assigned must be on the basis of seniority." [114] The Authority held the proposals nonnegotiable on this basis. "In * * * compelling the selection of a particular individual for temporary assignment to another position" —and thus removing the agency's discretion to make individual judgments based on the judgment and reliability of particular persons—the proposals "directly interfere[d] with the right of the agency to assign employees." [115]

 Union Proposal III was subjected to an identical analysis. It, however, was held negotiable because it reserved to the agency the option of using "competitive procedures" to make its selections. As defined in the *Federal Personnel Manual*, "competitive procedures" retain the agency's right to "select or not select from among a group of best qualified candidates." [116] To the Authority, this reserved discretion made a crucial difference:

> [U]nder Union Proposal III, the agency retains the option of exercising its discretion to select a particular employee for assignment. Only if the agency chooses not to use competitive procedures must it select the individual on the basis of seniority. Because Union Proposal III preserves in this manner the agency's discretion to select, the proposal does not directly interfere with the agency's basic right to assign employees under section 7106(a)(2)(A) of the Statute.[117]

Under the circumstances presented by this case, we believe that the FLRA's decisions concerning Proposals III, IV, V, VI, and VII must be upheld. We begin with the recognition that courts must yield great deference to an interpretation of a statute by the agency entrusted with its administration. *See, e. g., Griggs v. Duke Power Co.,* 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158 (1971); *United States v. City of Chicago,* 400 U.S. 8, 10, 91 S.Ct. 18, 20, 27 L.Ed.2d 9 (1970); *Udall v. Tallman,* 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965). "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the [persons] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.'" *Power Reactor Development Co. v. Int'l Union of Elec., Radio & Machine Wkrs,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961), *quoting Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933), in turn *quoted in Nat'l Federation of Federal Employees v. FLRA, supra,* 652 F.2d at 193, *and in Udall v. Tallman, supra,* 380 U.S. at 16, 85 S.Ct. at 801. The surface ambiguity of the central statutory distinction provides a further reason for us to defer to the considered judgment of the Authority. As we explained above, the task of distinguishing negotiable procedures from management's reserved substantive authority involves questions of judgment and balance, about which reasonable people could easily differ. And Congress intended the needed judgments to be made, not by this court, but by the Authority. "To sustain the Commission's application of [a] statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Compensation Comm'n v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1946), *quoted in Udall v. Tallman, supra,* 380 U.S. at 16, 85 S.Ct. at 801. As the Supreme Court has stated repeatedly, "[T]he construction of a statute by those charged with its exe-

---

**114.** *Id.* at 9, *Wright-Patterson* JA at 185 (footnote omitted).

**115.** *Id.* at 9–10, *Wright-Patterson* JA at 185–186.

**116.** *Federal Personnel Manual,* ch. 335, subch. 1–4, Requirement 4, *quoted in Wright-Patterson, supra* note 5, at 10 n.19, *Wright-Patterson* JA at 186 n.19.

**117.** *Wright-Patterson, supra* note 5, at 10, *Wright-Patterson* JA at 186.

cution should be followed unless there are compelling indications that it is wrong." *Miller v. Youakim*, 440 U.S. 125, 145 n.25, 99 S.Ct. 957, 969, 59 L.Ed.2d 194 (1979), *quoting Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969) (footnote omitted); *see Board of Gov. of Federal Reserve System v. First Lincolnwood Corp.*, 439 U.S. 234, 251, 99 S.Ct. 505, 514, 58 L.Ed.2d 484 (1978); *Zemel v. Rusk*, 381 U.S. 1, 11–12, 85 S.Ct. 1271, 1278–1279, 14 L.Ed.2d 179 (1965).

We find no compelling indications of error in the cases before us. On the contrary, the Authority's interpretation of the statute—as reserving a limited management discretion in employee selection—is entirely consistent with the admonition that "[t]he provisions of [Title VII of the Civil Service Reform Act] should be interpreted in a manner consistent with the requirement of an effective and efficient Government." [118] Moreover, it accords in both its aspects—its upholding of Proposal III and its rejection of Proposals IV, V, VI, and VII—with the sectional analysis of Section 7106 proffered by Representative Udall, the draftsman of the language enacted into law. Subsection (a)(2)(C) of Section 7106 reserves the management right to

make selections for appointments from—

(i) *among* properly ranked and certified candidates for promotion; or

(ii) any other appropriate source[.] [119]

As construed by Representative Udall, "The intent of this provision is to *preserve as bargainable * * * the standards, criteria, and procedures* for establishing promotion certificates, *while ensuring management's right to make the actual selection* from the certificate, or to make the appointment from any other appropriate source." [120] Proposal III, which reserves a management right to choose *among* candidates ranked according to competitive procedures, obviously qualifies as bargainable under the Udall analysis.[121] But Proposals IV, V, VI, and VII, which prescribe mandatory selections based on seniority, fail to pass its strictures.

We are untroubled by the agency's argument that the FLRA was barred from reaching its decisions without according deference to the body of decisional law that reserves management discretion of an important kind. Further, as we have noted, the statutory language necessitates judgmental line-drawing. Thus, although we do not regard the agency argument to be without force, we have no doubt that the ruling of the FLRA should be upheld against it. It is the FLRA, not this court, that has been entrusted by Congress with broad powers to administer Title VII and to establish policies and provide guidance thereunder. 5 U.S.C. § 7105; *see Nat'l Federation of Federal Employees v. FLRA, supra* note 74, 652 F.2d at 193; *Clark v. Mark*, N.D.N.Y. No. 79–CV–777 (Aug. 28, 1980); *Nat'l Federation of Federal Employees, Local 1263 v. Commandant, Defense Language Institute*, 493 F.Supp. 675 (N.D.Cal.1980). If the FLRA's construction of the statute is reasonably defensible, we are not free to reject it merely because we might decide differently if confronted with the question in the first instance. *See Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). Finding the FLRA's decision to be entirely defensible against this agency challenge, we need go no further in an unnecessary attempt to reach an independent conclusion on the merits of the contending arguments.

---

118. 5 U.S.C. § 7101(b).

119. 5 U.S.C. § 7106(a)(2)(C)(i) & (ii) (emphasis added).

120. 124 Cong.Rec. H9634 (daily ed. Sept. 13, 1978) (emphasis added).

121. The agency rightly notes that competitive procedures need not be used in all instances under Proposal III. And, if they are not employed, management would be compelled in particular cases to choose either the most senior "qualified employee" or none at all. Because agency "discretion" would thus be severely limited, if not "eviscerated," in these instances, the agency argues, the FLRA's ruling on this proposal must be reversed. We do not agree. By permitting the agency to use competitive procedures, Proposal III preserves the management right—in cases where management thinks it essential to do so—to identify and select employees on the basis of their personal job-related characteristics. The statutory goals of competence and efficiency are thus respected. Moreover, by allowing management to determine when the demands of a particular job assignment require selection on the basis of refined judgments of individual capabilities and when they do not, the proposal

had developed under the Federal Labor Relations Council. As we noted in our discussion of a similar claim raised in *Dix-McGuire, supra,* Congress plainly viewed Section 7106, if not Title VII as a whole, as a departure from the law that had developed under a comparable section of Executive Order 11491.[122] Moreover, there is legislative history to indicate that Congress intended Section 7135(b), not to bind the FLRA or necessarily even to influence its decisions, but only to provide continuity while the Authority developed its own body of interpretive law under the new statute.[123]

### Proposal XIII

The FLRA held Union Proposal XIII to be nonnegotiable for essentially the same reasons that it had rejected Proposals IV, V, VI, and VII. Proposal XIII detailed procedures that would have dictated certain personnel assignments in cases involving reductions in force "unless there are persuasive mission related reasons for not doing so, in which case the employer will provide the reasons in writing to the union and to the employee."[124] Concluding that the proposal would "compel the agency to assign an employee to a position on the basis of [the] employee's preference," the Authority held that it would "interfere[ ] with the discretion which is an essential part of the right to assign under section 7106(a)(2)(A) of the Statute."[125]

Having upheld the Authority's interpretation of the statute as reserving a nonnegotiable agency right to exercise discretion in making personnel assignments, we cannot say that the FLRA wrongly applied that interpretive standard to Proposal XIII. The proposal's exception to mandatory assignment in cases involving "persuasive mission related reasons" might have permitted the FLRA to draw a different conclusion about the scope of discretion that it reserved to management and thus about its negotiability. As we have already said, however, "To sustain the [Authority's] application of [a] statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Unemployment Compensation Comm'n v. Aragon, supra,* 329 U.S. at 153, 67 S.Ct. at 250. We need find only that it was not arbitrary, capricious, or contrary to law.[126]

---

**122.** *See* notes 98–101 *supra* and accompanying text.

**123.** Two members of the House committee that reported the provision that became 5 U.S.C. § 7135(b), § 7136(b) of H.R. 11280, explained its intent in this fashion in remarks to their colleagues on the House floor. Representative Ford stated:

> There was great concern that the new [A]uthority would simply "rubber-stamp" the decisions and procedures of the Federal Labor Relations Council that it replaces. The "superseded" language is intentionally included to make clear that the new [A]uthority, acting under its own statutory charter, is not to repeat past mistakes in the area of labor-management relations. * * *
>
> This subsection is included as drafted because of the concern that the development by the new [A]uthority of the contours of the new labor-management program will necessarily take time. During that time, questions about the legal efficacy of existing regulations and decisions could prove quite disruptive. Consequently, this subsection provides that such regulations and decisions will continue in force until superseded by regulations and decisions issued under [the statute].

124 Cong.Rec. H9651 (daily ed. Sept. 13, 1978).

> Representative Clay offered a similar interpretation:
>
> [This section includes] express recognition of our expectation that the new Federal Labor Relations Authority will issue decisions superseding those of the Council. (In the interest of continuity we also provide that Council decisions will continue in force until superseded.) We fully expect that the Authority will not repeat the mistakes of the Council, especially since the Authority is acting under a new statutory charter mandating a new approach to Federal labor-management relations.

124 Cong.Rec. H9638 (daily ed. Sept. 13, 1978). *See also* H.R.Rep.No.95–1403, *supra* note 81, at 60; S.Rep.No.95–969, *supra* note 80, at 114.

**124.** *Wright-Patterson, supra* note 5, at 23–24, *Wright-Patterson* JA at 199–200.

**125.** *Id.* at 24, *Wright-Patterson* JA at 200.

**126.** Section 7123(c) of the Civil Service Reform Act, 5 U.S.C. § 7123(c), states that judicial

Under this deferential standard[127] we have no difficulty in affirming the finding of the FLRA that the proposal would eviscerate an element of discretion protected under Section 7106(a).[128]

## Proposal XIV

■ Review of the FLRA's decision concerning Proposal XIV necessarily involves us, like the Authority, in an examination of federal personnel law and regulations, the two underlying bases for the agency's claim of nonnegotiability.

Proposal XIV concerns the circumstances in which an employee who is temporarily assigned to a higher graded position will be paid at the rate associated with the higher grade. Specifically, the proposal provides that "the employee will receive the rate of pay for the higher position to which assigned, commencing on the 31st day."[129] The FLRA held the proposal to be negotiable. The agency argues otherwise, claiming that adoption of the proposal would require it to violate both statutory law and applicable regulations.

In its argument before the FLRA the agency contended that Proposal XIV was contrary to law because it would require payment of employees at grade levels to which they had not been promoted.[130] The Authority accepted the agency's statement of law: that a federal employee is entitled to the pay of a higher graded position only when promoted to it.[131] However, in the

absence of contrary indications, the Authority interpreted the union proposal as requiring the employee selected by management to be given a temporary promotion to the position to which assigned.[132] Under this reasonable construction we agree with the FLRA that the agency has not shown the proposal to be inconsistent with applicable law.

The agency also challenges Proposal XIV as incompatible with pertinent federal regulations.[133] The *Federal Personnel Manual*, it asserts, renders nonnegotiable any union proposal—such as this one—that would require a federal agency to make temporary promotions to "encumbered" positions. To make such promotions, the agency argues, it would need to "create" new positions to which employees could be temporarily assigned. And the requirement that it do so, this argument continues, would violate management's statutory prerogative not to bargain over numbers and grades of employees.

Crucial to this argument is the assumption that applicable regulations permit temporary promotions only to existing yet vacant positions. According to the agency, "Unless truly vacant positions exist, temporary promotions require creation of new positions, which * * * cannot be occupied by two employees simultaneously."[134] We reject the agency's argument because it has failed to persuade us of the truth of this

review of FLRA decisions shall be in accordance with 5 U.S.C. § 706 (1976). As here relevant, 5 U.S.C. § 706 provides that agency action is to be set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). *See Nat'l Federation of Federal Employees v. FLRA, supra* note 74, 652 F.2d at 192.

127. *See, e.g., id.; Ethyl Corp. v. EPA,* 541 F.2d 1, 34–37 (D.C.Cir.) (*en banc*), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

128. The FLRA's decision that the agency must be able to retain the right to make discretionary choices among candidates for assignment in every case is by no means without support in the legislative history. Representative Udall's analysis of § 7106(a)(2)(C), *quoted in* text at

note 120 *supra,* suggests that Congress intended management to retain discretion of this kind.

129. *Wright-Patterson, supra* note 5, at 25, *Wright-Patterson* JA at 201.

130. *See id.* at 26, *Wright-Patterson* JA at 202.

131. *See id.* (citing cases).

132. *Id.*

133. *See* reply brief for petitioners Department of Defense *et al.,* No. 80–1351, at 14–16.

134. Brief for petitioners Department of Defense *et al.,* No. 80–1351, at 23.

crucial assumption on which the challenge rests.

To support its position the agency relies primarily on a 1925 opinion by the Comptroller General,[135] which held that two employees cannot be "appointed, temporarily or permanently," to the same position.[136] But it fails to reckon adequately with applicable personnel regulations, and indeed with more recent rulings issued by the Comptroller General, which establish that an employee may be temporarily *assigned* to a position without being *"appointed to"* it. Our review of the *Federal Personnel Manual* suggests two procedures through which the requisite temporary assignments might occur.

First, the *Federal Personnel Manual* provides expressly that an employee may be "detailed" to a nonvacant position without being "appointed to" it:

> A *detail* is the temporary assignment of an employee to a different position for a specified period, with the employee returning to his regular duties at the end of the detail. Technically, a position is not *filled* by a detail, as the employee continues to be the incumbent of the position to which detailed.[137]

Recent decisions by the Comptroller General confirm that a position need not be vacant in order for an employee to be "detailed" to it, granted a temporary promotion for the period of the detail, and paid accordingly.[138]

Alternatively, although we recognize that the *Federal Personnel Manual* distinguishes for some purposes between a "detail" and a "temporary promotion," [139] we are unpersuaded that a "temporary promotion" necessarily constitutes an "appointment" that cannot be made in the absence of a "vacancy." Nor do we believe that the Comptroller General—on whose opinions the agency so heavily relies—would conclude otherwise. Indeed, we are influenced in our decision by a recent opinion, upholding the legitimacy of a "detail" to an encumbered position, in which the Comptroller General found support for his conclusion in sections of the *Federal Personnel Manual* dealing with "temporary promotion":

> (Emphasis added.) As construed by the agency, this provision establishes that "details" may not generally be used to effect temporary promotions to encumbered positions. Rather, it says, the provision requires creation of a second position. The flaw in this argument lies apparent in the language of the regulation on which it rests. Although establishment of a second position may sometimes be "appropriate," we are unable to conclude that it is mandatory. We note that the recent decisions of the Comptroller General cited *supra*, which have upheld "temporary promotions" to "detailed" employees and increased pay based thereon, have expressed no worry about the legal propriety of detailing employees to encumbered positions. Details are, of course, limited to 120 days unless prior approval is obtained from the Office of Personnel Management, *see Federal Personnel Manual*, ch. 300, subch. 8–4e.

---

**135.** It is the duty of the Comptroller General to render decisions regarding the legality of expenditures of appropriated funds to heads of agencies and to certifying and disbursing officers. 31 U.S.C. §§ 75, 82d (1976).

**136.** 4 Comp.Gen. 729, 730 (1925). The agency also cites 14 Comp.Gen. 785 (1935).

**137.** *Federal Personnel Manual*, ch. 300, subch. 8–1, *quoted in* brief for respondent FLRA, Nos. 80–1351 and 80–1358, at 61 n.51 (emphasis in original).

**138.** *See* 57 Comp.Gen. 767, 769 (1978); *Matter of Joe F. McLeod—Claim for Backpay*, Comp. Gen. Decision B–191642 (Nov. 17, 1978).
 In its brief in this court, *see* brief for petitioners Department of Defense *et al.*, No. 80–1351, at 22, the agency argues that the cases involving "details" are not relevant to the issue before us. It puts its argument on Chapter 312, Subchapter 4–2 of the *Federal Personnel Manual*:
> Situations also arise in which a position is filled but the employee is not present for duty. * * * [In such cases] it is *appropriate* to establish an additional identical position as a basis for assigning another employee to perform these duties. * * *

**139.** *See Federal Personnel Manual*, ch. 300, subch. 8–4e ("Except for brief periods, an employee should not be detailed to perform work of a higher grade level unless there are compelling reasons for doing so. Normally, an employee should be given a temporary promotion instead.").

In addition, FPM chapter 335, subchapter 4, lists some uses of a temporary promotion. Included are situations where an employee has to perform the duties of a position during the extended absence of an incumbent, to fill a position which has become vacant until a permanent appointment is made, to assume responsibility for an increased workload for a limited period, or to participate in a special project which will last for a limited period. In this connection we point out that there is only one example cited which requires a vacant position. Moreover, it is apparent that there is no vacant position when an employee is temporarily promoted to perform the duties of a position during the extended absence of the incumbent.[140]

Finding that the agency has failed to show that adoption of Proposal XIV would be proscribed by applicable law or regulation, we affirm the decision of the FLRA that it was a proper subject of bargaining under the Civil Service Reform Act.

## V

For the reasons stated herein, we conclude that the challenged holdings of the FLRA in these three consolidated cases should be upheld and that its orders here before us should be enforced.

*Judgment accordingly.*