NATIONAL TREASURY EMPLOYEES
UNION, Petitioner,

v.

FEDERAL LABOR RELATIONS
AUTHORITY, Respondent.

No. 80–1895.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 18, 1981.

Decided Oct. 12, 1982.

Robert M. Tobias, Washington, D. C., for petitioner. William E. Persina, Wash-

ington, D. C., also entered an appearance for petitioner.

Mary Elizabeth Medaglia, Associate Sol., Fed. Labor Relations Authority, with whom Marian R. Fox, Atty., Fed. Labor Relations Authority, Washington, D. C., was on the brief for respondent.

Before ROBINSON, Chief Judge, GINS-BURG, Circuit Judge, McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Chief Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Chief Judge:

This petition launches judicial review of a decision and order of the Federal Labor Relations Authority holding that the promulgation of performance standards for federal civil service employees and the identification of the critical elements of their jobs are included in the package of rights reserved to management officials of federal agencies by Title VII of the Civil Service Reform Act of 1978,[1] commonly known as the Federal Labor-Management Relations Act,[2] and consequently do not fall within the duty to bargain imposed by that legislation. Our careful examination of the Act and its relevant legislative history leads us to conclude that this interpretation must

stand. Accordingly, we affirm the Authority's action.

### I. STATUTORY AND REGULATORY FRAMEWORK

Petitioner, National Treasury Employees Union, is the exclusive representative of the employees in the bargaining unit of the Treasury Department's Bureau of Public Debt.[3] All of these employees are covered by the Federal Labor-Management Relations Act. Passed in 1978 in an effort to comprehensively remodel the federal civil service system, the Act restructured labor-management relations in the Federal Government. In adopting the Act, Congress sought to strengthen federal management's control over hiring and firing of employees, and simultaneously to buttress the status of employee unions in the federal sector.[4] In recognition of these goals, the Act declares that the public interest is served both by higher standards of employee performance and by collective bargaining in the civil service.[5]

Federal employers are expressly required by the Act to engage in collective bargaining,[6] defined as a "good faith effort to reach agreement with respect to the conditions of employment."[7] The statutory phrase "conditions of employment" is in turn defined as "[p]ersonnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting

---

**1.** Pub.L.No. 95–454, tit. VII, 92 Stat. 1191 (1978), 5 U.S.C. §§ 7101 *et seq.* (Supp. IV 1980) [hereinafter cited as codified].

**2.** Likewise, we refer to Title VII by that appellation.

**3.** Brief for Petitioner at 2; see 5 U.S.C. § 7111 (Supp. IV 1980). The Bureau is responsible generally for the issuance of government securities to the public. Brief for Petitioner at 2.

**4.** See Part III(B) *infra.*

**5.** 5 U.S.C. § 7101(a) (Supp. IV 1980), providing:

Congress finds that—
(1) experience in both private and public employment indicates that the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them—
(A) safeguards the public interest,

(B) contributes to the effective conduct of public business, and
(C) facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment; and
(2) the public interest demands the highest standards of employee performance and the continued development and implementation of modern and progressive work practices to facilitate and improve employee performance and the efficient accomplishment of the operations of the Government.

**6.** *Id.* § 7114(a)(4). An agency and the exclusive bargaining representative of its employees must "meet and negotiate in good faith for the purpose of arriving at a collective bargaining agreement." *Id.*

**7.** *Id.* § 7103(a)(12).

working conditions."[8] By equally positive terms of the Act, however, the duty to bargain does not extend to proposals inconsistent with federal law or some government-wide rule or regulation.[9] In this context, Section 7106(a) of the Act[10] reserves specific rights to management, providing pertinently for this case that

> [n]othing in [the Act] shall affect the authority of any management official of any agency . . .
>> (A) to hire, assign, direct, lay off, and retain employees. . .
>> (B) to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted.

Thus, a proposal calling for negotiation over exercise of one or more of the management rights enumerated in Section 7106(a)[11] clashes with federal law, and it is not within the employing agency's duty to bargain.

The Act is administered by the Federal Labor Relations Authority,[12] an independent bipartisan agency within the Executive Branch which succeeded the Federal Labor Relations Council.[13] The Authority's role in federal employment is analogous to that of the National Labor Relations Board[14] in the private sector.[15] Under its statutory mandate, the Authority must determine units appropriate for union organization and bargaining,[16] conduct representation elections,[17] adjudicate unfair labor practice complaints,[18] and resolve negotiability disputes.[19]

As part of its comprehensive effort to reform the civil service, Congress also revised the methodology for appraising employee performance. That process, as reconstructed, seeks to assure accurate evaluations of job performance through use of objective criteria.[20] Each agency must develop one or more performance-appraisal systems,[21] and these systems must, in turn, provide for establishment of objective and job-related performance standards tied to the demands of the employee's position.[22]

---

8. *Id.* § 7103(a)(14).

9. *Id.* § 7117(a)(1), providing that "the duty to bargain in good faith shall, to the extent not inconsistent with any Federal Law or any Government-wide rule or regulation, extend to matters which are the subject of any rule or regulation only if the rule or regulation is not a Government-wide rule or regulation." *Id.*

10. *Id.* § 7106(a).

11. As we shall see, the right implicated vitally in this litigation is to "direct . . . employees" and "assign work."

12. The Authority came into being in 1978. See Part III(B) *infra*. It now serves, among other capacities, as a central policymaking body for labor-management relations in the federal service. See 5 U.S.C. § 7105 (Supp. IV 1980). The Authority consists of three full-time members appointed by the President with the advice and consent of the Senate. *Id.* § 7104.

13. The Council was created by Executive Order 11491, originally issued in 1969, to exercise administrative authority over the then-existent labor-management relations program for federal employees. 3 C.F.R. 861 (1966–1970 Compilation), *reprinted at* 5 U.S.C. § 7101 note (Supp. IV 1980).

14. See 29 U.S.C. §§ 151 *et seq.* (1976).

15. See *Department of Defense v. FLRA,* 212 U.S.App.D.C. 256, 260, 659 F.2d 1140, 1144 (1981), *cert. denied,* 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982).

16. 5 U.S.C. § 7105(a)(2)(A) (Supp. IV 1980).

17. *Id.* § 7105(a)(2)(B).

18. *Id.* § 7105(a)(2)(G).

19. *Id.* § 7117(c)(1). The Authority has promulgated regulations setting forth the appeal procedures to be utilized in such disputes. See 5 C.F.R. § 2424 (1980). The power to convene a hearing prior to resolving the issues is granted to the Authority by statute. See 5 U.S.C. § 7117(b) (Supp. IV 1980).

20. *Id.* § 4302(b)(1).

21. *Id.*

22. *Id.,* specifying:

> Under regulations which the Office of Personnel Management shall prescribe, each performance appraisal system shall provide for—
> (1) establishing performance standards which will, to the maximum extent feasible, permit the accurate evaluation of job performance on the basis of objective criteria

The agency is directed to communicate both the standards and the critical elements of the position to the employee.[23] The results of the required performance appraisals are to be used as the basis for rewarding and promoting employees, reducing them in grade, and retaining or removing them.[24]

Quite obviously, the concepts of "performance standards" and "critical elements" of a position are key features of the performance-appraisal systems. As defined by the Office of Personnel Management, a performance standard is the "express measure of the level of achievement by management for the duties ... of a position." [25] Similarly, a critical element is a "component of an employee's job that is of sufficient importance that performance below the minimum standards ... requires remedial action and denial of within grade increases, and may be the basis for removing or reducing the level of that employee." [26] The potential importance of these aspects of performance-appraisal systems is reflected by the specific statutory requirement that agencies encourage employee participation in the development of performance standards.[27]

## II. FACTUAL BACKGROUND OF THE LITIGATION

Pursuant to the latter directive, the Bureau of Public Debt informed petitioner in February of 1979 that it planned to institute new standards of performance for the Bureau's accounts maintenance clerks.[28] Petitioner requested negotiations over the substance, impact and implementation of changes.[29] The Bureau took the position that it would negotiate the impact and implementation of the proposals, but not the substance of any standard.[30]

Ultimately, petitioner submitted the following proposal:

Accounts Maintenance Clerks (GS 520⅗) must maintain the following minimum rates:

1. To retain his/her position, incumbent must process 9.0 batches per hour.[31]

As part of the Bureau's performance-appraisal system, this proposal would have identified batch-processing as a critical element of an accounts maintenance clerk's position, and would have fixed nine batches per hour as the minimum performance ac-

---

(which may include the extent of courtesy demonstrated to the public) related to the job in question for each employee or position under the system.

**23.** *Id.* § 4302(b)(2).

**24.** *Id.* § 4302(a)(3).

**25.** 5 C.F.R. § 430.202(d) (1982).

**26.** *Id.* § 430.202(e).

**27.** "Each agency shall develop one or more performance appraisal systems which ... shall encourage employee participation in establishing performance standards." 5 U.S.C. § 4302(a)(2) (Supp. IV 1980).

**28.** Statement of Position on Behalf of the Bureau of Public Debt, FLRA No. 0–ng–56 (June 25, 1979) at 3, Petitioner's Appendix (App.) 11. A proposed standard would substitute fixed performance levels for an existing floating standard of 85% of the group average performance. *Id.* at 2, App. 10. In its brief before the Authority, the Bureau explained that this change in the production standard would respond to a decision of the Federal Employee Appeals Authority indicating that the Bureau's

floating standard was improper because neither fair nor objective. *Id.;* see Federal Employee Appeals Authority, Dec. No. DA531170003 (June 8, 1978). As ultimately implemented by the Bureau, the standard sets performance levels of 9.5 batches per hour for job retention, and 10.0 batches per hour for a within grade increase. Brief for Petitioner at 3.

**29.** Statement of Position on Behalf of the Bureau of Public Debt, *supra* note 28, at 3, App. 11.

**30.** *Id.*

**31.** *National Treasury Employees Union,* 3 F.L.R.A. 769 (1980) [hereinafter cited as *NTEU* ]. Petitioner's proposal also provided that an incumbent must process 9.0 batches per hour in order to be eligible for a within-grade step increase. *Id.* The Authority held that this suggestion was inconsistent with 5 C.F.R. § 531.-407(c)(1) (1982) because it set the same standard of performance for both within-grade step increases and job retention, and that in any event it was not a proper subject of negotiation. *Id.* at 782. Petitioner has not contested that determination on this appeal.

ceptable for those in that position.[32] The Bureau felt that this proposal usurped nonnegotiable prerogatives of management, and refused to bargain;[33] and, as was its statutory right,[34] petitioner filed a negotiability appeal with the Authority.[35] The appeal was consolidated with sixteen others for purposes of oral argument on the question whether and to what extent performance-appraisal systems, and the performance standards they include, are bargainable under the Act.[36]

In its decision in the instant case, the Authority concluded that establishment of performance standards and identification of critical job elements are within the scope of the power reserved exclusively to management by Section 7106(a) to "direct employees" and "assign work."[37] The Authority further held that petitioner's proposal directly interfered with those functions, and therefore was not a proper subject of negotiation because inconsistent with federal law.[38] It is this determination that petitioner now challenges. The principal issue presented for resolution, then, is whether management's statutorily-reserved right to direct employees and assign work properly encompasses formulation of performance standards and ascertainment of critical job elements in discharge of an agency's responsibility for development of an objective performance appraisal system.

In support of its decision, the Authority contends that its interpretation of the management-rights section, and the corresponding interpretation of agencies' duty to bargain, further the congressional intent manifest in the Act and its legislative history to provide federal agencies with the authority and flexibility essential to accomplishment of their respective missions.[39] The Authority asserts, as it did in the decision under review,[40] that implementation of petitioner's proposal would encumber exercise of an agency's statutory prerogative to direct employees and assign work.[41]

Petitioner argues strenuously that the obligation to bargain in good faith which the Act imposes upon federal employers[42] is to be broadly construed, and reciprocally that exceptions to that obligation are to be read narrowly.[43] Thus, petitioner urges that the management-rights exemption from the employer's duty to bargain cannot be said to encompass the development of performance-appraisal systems.[44] Petitioner further asserts that relevant Authority precedents[45] establish that before a proposal may properly be termed nonnegotiable, it must relate directly and integrally to a reserved management right, and directly impinge upon that right.[46] Petitioner vigorously contests the Authority's view that

---

**32.** Brief for Respondent at 12. Petitioner has not disputed this characterization of its proposal.

**33.** Memorandum from William R. Kansier, Supervisory Labor Relations Specialist, to James Sober, Assistant Counsel, National Treasury Employees Union (Apr. 18, 1979), attachment to Negotiability Appeal (Apr. 26, 1979), App. 3. This memorandum argued nonnegotiability on the ground that the proposal was intricately related to staffing patterns, and thus affected management's right to assign work, assign and retain employees, and intruded upon agency efficiency and effectiveness. *Id.*

**34.** See 5 U.S.C. § 7117(c) (Supp. IV 1980).

**35.** See Negotiability Appeal, *supra* note 33.

**36.** Notice of Hearing, FLRA case No. 0–ng–56 (Feb. 4, 1980), App. 82.

**37.** *NTEU, supra* note 31, 3 F.L.R.A. at 775–776; see notes 79–82 *infra* and accompanying text.

**38.** 3 F.L.R.A. at 778.

**39.** Brief for Respondent at 22.

**40.** *NTEU, supra* note 31, 3 F.L.R.A. at 778; see notes 79–88 *infra* and accompanying text (discussing *NTEU*).

**41.** Brief for Respondent at 28–30.

**42.** See text *supra* at notes 6–9.

**43.** Brief for Petitioner at 10.

**44.** *Id.* at 10, 12.

**45.** See *American Fed'n of Gov't Employees, Local 3669,* 2 F.L.R.A. 641 (1980); *American Fed'n of Gov't Employees, Local 1603,* 3 F.L.R.A. 4 (1980); *International Ass'n of Firefighters, Local F. 61,* 3 F.L.R.A. 438 (1980).

**46.** Brief for Petitioner at 12.

performance standards for critical job elements are determinative of the quantity, quality or timeliness of any given employee's work.[47] That conclusion, petitioner asserts, is not supported by either evidence or logic; such standards, by petitioner's lights, have no effect until an evaluation is made *after* an employee has completed the work assigned, and thus cannot interfere with an exercise of reserved management authority.[48] Petitioner therefore says that the required relationship and impact are absent here.[49]

## III. ANALYSIS AND DECISION

### A. Standard of Review

We begin our consideration of the issue heedful of the appropriate standard of review. Jurisdiction to hear petitioner in this court is founded on Section 7123(c) of the Federal Labor-Management Relations Act.[50] That section provides that review of an order of the Authority shall be conducted on the record in accordance with Section 706 of the Administrative Procedure Act,[51] which, in turn, requires the reviewing court to set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." [52]

 In determining whether the Authority's decision is vulnerable for any of these reasons, we also bear firmly in mind that courts must give considerable deference to an agency's interpretation of its enabling legislation.[53] Deference is particularly appropriate when, as here, the administrative practice in issue involves a "contemporaneous construction of a statute by the [agency] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." [54] To sustain the agency's application of a statutory term, "we need not find that its construction is the only reasonable one, or even

---

**47.** *Id.* at 15.

**48.** *Id.*

**49.** *Id.* Petitioner also contends that Authority precedent requires an agency to introduce evidence in support of its claim that the employees' proposal infringes the implicated management right, and that the Bureau of Public Debt failed to carry this burden in the instant case. Brief for Petitioner at 13. Petitioner cites *International Ass'n of Firefighters, supra* note 45, which involved a union proposal that allegedly interfered with management's right to determine its budget. See 3 F.L.R.A. at 446; 5 U.S.C. § 7106(a)(1) (Supp. IV 1980) (nothing in Act shall affect authority of any management official of any agency to determine agency's budget). In *Firefighters,* the Authority held that when a union proposal does not explicitly establish a budgetary figure, the agency must make a substantial demonstration that the proposal would lead to an increase in costs, and that such increase would not be offset by other factors, before the proposal would be held to interfere with management's budgetary authority. 3 F.L.R.A. at 450–452, citing and quoting *American Fed'n of Gov't Employees,* 2 F.L.R.A. 604, 608 (1980). Lacking anything else on point, we can accept the cited decision as precedent only for cases in which management's right to determine its budget is involved, and not as a pronouncement of general principles governing the parties' respective burdens of proof. Moreover, evidence is hardly needed to demonstrate the effect that implementation of petitioner's proposal would have on managerial freedom to direct employees and direct work. *Firefighters* is thus inapposite, and petitioner's argument is unpersuasive.

**50.** 5 U.S.C. § 7123(c) (Supp. IV 1980).

**51.** *Id.*

**52.** *Id.* § 706(2)(A) (1976).

**53.** See, *e.g., Griggs v. Duke Power Co.,* 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158, 165 (1971); *United States v. City of Chicago,* 400 U.S. 8, 10, 91 S.Ct. 18, 20, 27 L.Ed.2d 9, 12–13 (1970); *Zemel v. Rusk,* 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179, 187 (1965); *National Fed'n of Fed. Employees v. FLRA,* 209 U.S.App.D.C. 198, 200, 652 F.2d 191, 193 (1981).

**54.** *Power Reactor Dev. Co. v. International Union of Elec., Radio & Mach. Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed. 924, 932 (1961), quoting *Norwegian Nitrogen Prod. Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796, 807 (1933); see *Department of Defense v. FLRA, supra* note 15, 212 U.S.App.D.C. at 277, 659 F.2d at 1161 (applying principle to review of FLRA action); *National Fed'n of Fed. Employees v. FLRA, supra* note 53, 209 U.S.App.D.C. at 200, 652 F.2d at 193 (same).

that it is the result we would have reached ... in the first instance ...."[55] Instead, we should adopt the agency's interpretation if it is reasonably defensible[56] and there is no compelling indication of error.[57] Mindful, then, of the necessarily deferential nature of our review, we begin our analysis of the challenged decision.

## B. *Legislative History*

■ As is evident from the foregoing discussion, the issue posed initially by this appeal is one of statutory interpretation. In construing ambiguous terms of legislation, the intent of Congress is paramount, and this intent may appropriately be ascertained from relevant legislative history.[58]

To that we now turn for such light as it may shed.

The Federal Labor-Management Relations Act traces its origin to a labor-management relations title offered by Representative Udall as an amendment to substitute for its counterpart in a bill reported by the House Committee on Post Office and Civil Service.[59] As petitioner asserts,[60] Congress, in adopting that amendment, sought to expand the scope of bargaining beyond that permitted under preexisting practice,[61] and contemplated that Section 7106(a) would accommodate that aim.[62] Representative Udall indicated during House debate that, although his substitute management-rights clause was stronger than the one

---

**55.** *Department of Defense v. FLRA, supra* note 15, 212 U.S.App.D.C. at 277, 659 F.2d at 1161, quoting *Unemployment Compensation Comm'n v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136, 145 (1946).

**56.** *Department of Defense v. FLRA, supra* note 15, 212 U.S.App.D.C. at 278 n.121, 659 F.2d at 1162 n.121.

**57.** *Id.* at 277, 659 F.2d at 1161; see *NLRB v. Hendricks County Rural Elec. Membership Club,* 454 U.S. 170, 176, 102 S.Ct. 216, 222, 70 L.Ed.2d 323, 330 (1981); *Miller v. Youakim,* 440 U.S. 125, 145 n.25, 99 S.Ct. 957, 969 n.25, 59 L.Ed.2d 194, 209 n.25 (1979).

**58.** See, *e.g., Allen v. State Bd. of Elections,* 393 U.S. 544, 566, 89 S.Ct. 817, 832, 22 L.Ed.2d 1, 17 (1969); *United States v. Donruss Co.,* 393 U.S. 297, 307, 89 S.Ct. 501, 507, 21 L.Ed.2d 495, 503 (1969); *Aviation Consumer Action Project v. Washburn,* 175 U.S.App.D.C. 273, 279, 535 F.2d 101, 106 (1976); *Chemehuevi Tribe of Indians v. FPC,* 160 U.S.App.D.C. 83, 91, 489 F.2d 1207, 1215 (1973).

**59.** 124 Cong.Rec. 29174 (1978) (remarks of Representative Udall), *reprinted in* Subcommittee on Postal Personnel and Modernization of the Committee on Post Office and Civil Service, 96th Cong., 1st Sess., Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978, at 907 (1979) [hereinafter cited as *Legislative History*]. This amendment was accepted by the House, 124 Cong.Rec. 29220 (1978), *reprinted in Legislative History, supra,* at 965, and was later adopted by the House-Senate Conference Committee without revisions. See Joint Explanatory Statement of the Committee on Conference, H.R.Rep.No. 95–1717, 95th Cong., 2d Sess. 158 (1978), reprinted in *Legislative History, supra,* at 793.

**60.** Brief for Petitioner at 18.

**61.** A program incorporating labor-management negotiations in the federal sector was inaugurated in 1962. See, *e.g.,* Exec. Order No. 10988, 3 C.F.R. 521–528 (1959–1963 Compilation); Exec. Order No. 11491, 3 C.F.R. 861–875 (1966–1970 Compilation). The process did not receive statutory sanction until passage of the Act in 1978.

**62.** See, *e.g.,* 124 Cong.Rec. 29198 (1978) (remarks of Representative W. Ford) (scope of bargaining under § 7106 to be substantially broader under Udall substitute than under Exec. Order No. 11491, its immediate predecessor), reprinted in *Legislative History, supra* note 59, at 954; 124 Cong.Rec. 29187 (1978) (remarks of Representative Clay) (Udall substitute embodied approach of committee that scope of collective bargaining under act would be greater than under Exec. Order No. 11491), reprinted in *Legislative History, supra* note 59, at 932. There were significant expressions of dissatisfaction with the Federal Labor Relations Council's interpretation of that executive order. See, *e.g.,* 124 Cong.Rec. 29198 (1978) (remarks of Representative W. Ford) ("too often the Council interpreted the management rights clause [of the executive order] so broadly as to stifle an attempt by both management and employees to address commonly recognized problems"), reprinted in *Legislative History, supra* note 59, at 953; 124 Cong.Rec. 29187 (1978) (remarks of Representative Clay) (Council departed from interpretative canon that management-rights clause be construed as narrow exception to obligation to bargain), reprinted in *Legislative History, supra* note 59, at 932.

reported by the House Committee, "it is still to be treated as an exception to the general obligation to bargain over conditions of employment."[63] Representative William Ford, another key figure in adoption of the Udall amendment, indicated a similar understanding.[64]

These expressions of legislative purpose, however, cannot be read in isolation.[65] Other statements by Members of Congress demonstrate that the narrow treatment anticipated for Section 7106(a) was not intended to swallow that section entirely. Representative Clay, for example, introduced his discussion of Section 7106(a) by observing that "at *no time* during the Committee deliberations or afterwards was it suggested that Federal employee labor organiza-

tions should be allowed to bargain over *every conceivable topic*."[66] Representative Ford, a strong advocate of employee rights,[67] similarly voiced an expectation that the management-rights clause "will adequately protect *genuine* managerial rights."[68]

Perhaps more importantly, however, the legislative history also reflects a broader congressional desire to preserve the Federal Government's ability to operate in an effective and efficient manner. Both the House and the Senate Reports emphasize this important goal.[69] Representative Clay, supporting the Udall amendment, declared that "the public and taxpayer deserve the more effective and efficient federal government that is [a] predictable result of" the Udall

---

**63.** 124 Cong.Rec. 29183 (1978) (remarks of Representative Udall), reprinted in *Legislative History, supra* note 59, at 925.

**64.** Representative Ford stated that

[a] principal goal in revising the management rights clause is to change the current situation and, wherever possible, encourage both parties to work out their differences in negotiations. . . . In retaining a management right clause in our original draft of title VII, Mr. Clay and I, as well as the committee intended however that this section be read very narrowly. In agreeing to the Udall compromise of adding several more portions to this section, we fully intended that the committee's original position go unchanged and that this section be narrowly construed.

124 Cong.Rec. 29198 (1978) reprinted in *Legislative History, supra* note 59, at 954. See also 124 Cong.Rec. 29187 (1978) (remarks of Representative W. Clay), reprinted in *Legislative History, supra* note 59, at 932.

**65.** See *Allen v. State Bd. of Elections, supra* note 58, 393 U.S. at 568–569, 89 S.Ct. at 833, 22 L.Ed.2d at 19; *cf. Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591–592, 7 L.Ed.2d 492, 499 (1962).

**66.** 124 Cong.Rec. 29187 (1978) (remarks of Representative Clay) (emphasis added), reprinted in *Legislative History, supra* note 59, at 932.

**67.** Representative Ford's comments on the House floor attest to his stand. See, *e.g., id.* at 29198 (remarks of Representative W. Ford), reprinted in *Legislative History, supra* note 59, at 953.

**68.** *Id.* at 29199 (remarks of Representative W. Ford) (emphasis added), reprinted in *Legislative History, supra* note 59, at 956. He continued:

Thus, although management has the right to direct the work force, proposals aimed at lessening the adverse impact on employees of an exercise, perhaps arbitrary, of that right are fully negotiable.

*Id.* This reference to negotiation on questions of adverse impact is an allusion to § 7106(b)(3), which provides that "nothing . . . shall preclude an agency and labor organization from negotiating . . . appropriate arrangements for employees adversely affected by the exercise of any [management] authority." 5 U.S.C. § 7106(b)(3) (Supp. IV 1980). This section appeared in the Committee version, and was retained with little change in the Udall amendment. Compare H.R. 11280, § 7106(b)(1)–(2), 96th Cong., 1st Sess. (1978), reprinted in *Legislative History, supra* note 59, at 372, 392, with 124 Cong.Rec. 29176 (1978) (Udall amendment), reprinted in *Legislative History, supra* note 59, at 911. Representative Ford's own dissatisfaction with the relatively limited scope of bargaining under Executive Order 11491 was alleviated, at least in part, by inclusion of this provision. See *id.* at 29198 (remarks of Representative W. Ford), reprinted in *Legislative History, supra* note 59, at 953.

**69.** See S.Rep.No. 95–969, 95th Cong., 2d Sess. 2–4 (1978), U.S.Code Cong. & Admin.News, p. 2723, reprinted in *Legislative History, supra* note 59, at 745–755; H.R.Rep.No. 95–1403, 95th Cong., 2d Sess. 3 (1978), reprinted in *Legislative History, supra* note 59, at 679; see also Message of President Carter to the Congress, 14 Weekly Comp. of Pres. Doc. 444 (March 2, 1978), reprinted in *Legislative History, supra* note 59, at 622.

program.[70] Senator Percy pointed out during floor debate that the bill sought to balance employee rights against "the need of the government to maintain the efficiency of its operations."[71] Indeed, we are required by the very terms of the Act to interpret its provisions "in a manner consistent with the requirement of an efficient and effective Government."[72] It thus is clear that Congress expressly recognized and protected the Government's ability to create and preserve an efficient and effective civil service system.[73]

As we recently observed in *Department of Defense v. FLRA*,[74] Congress also intended that the judgment and balance essential to determinations on the bargainable nature of issues arising under the Act would be exercised, not by courts, but instead by the Authority.[75] Thus, in *Department of Defense* we concluded that the distinction between proposals encroaching on management's nonnegotiable substantive authority and those concerning properly negotiable procedural matters was primarily to be made by the Authority in an exertion of its

expertise[76]—the result, we said, best serving the congressional design.[77]

## C. *The Authority's Decision*

Given these manifestations of legislative intent, we simply cannot say that the Authority's decision in the case at bar is not reasonably defensible. On the contrary, it is plain enough to us that its logic and outcome are entirely faithful to the statutory goals.

In finding that petitioner's proposal interfered with rights conferred upon management by Section 7106(a),[78] and thus was not negotiable, the Authority first examined the nature of the management prerogatives confirmed by that section.[79] The right to "direct employees" was defined by the Authority as embracing the ability to supervise and guide employees in the performance of their jobs;[80] the right to "assign work," the Authority held, includes the exercise of discretion in determining the duties to be assigned, the particular employees to whom work will be assigned, and the

**70.** 124 Cong.Rec. 29187 (1978) (remarks of Representative Clay), reprinted in *Legislative History, supra* note 59, at 931.

**71.** 124 Cong.Rec. 33389 (1978) (remarks of Senator Percy), reprinted in *Legislative History, supra* note 59, at 1040; *cf. id.* at 29182 (remarks of Representative Udall) (Act creates balance between management and employee rights), reprinted in *Legislative History, supra* note 59, at 923. Senator Percy was the ranking minority member of the Senate Committee on Governmental Affairs, which was responsible for the legislation in the Senate. 124 Cong.Rec. 5482 (1978) (remarks of Senator Percy), reprinted in *Legislative History, supra* note 59, at 1006.

**72.** 5 U.S.C. § 7101(b) (Supp. IV 1980), in full text reading:

It is the purpose of [the Act] to prescribe certain rights and obligations of the employees of the Federal Government and to establish procedures which are designed to meet the special requirements and needs of the Government. The provisions of [the Act] should be interpreted in a manner consistent with the requirement of an effective and efficient government.

**73.** See *Department of Defense v. FLRA, supra* note 15, 212 U.S.App.D.C. at 276–278, 659 F.2d at 1160–1162.

**74.** *Supra* note 15.

**75.** 212 U.S.App.D.C. at 277, 659 F.2d at 1161.

**76.** *Id.* The distinction between procedure and substance, so crucial in *Department of Defense,* is not at issue in the present case.

**77.** *Id.*

**78.** See 5 U.S.C. § 7106(a) (Supp. IV 1980), quoted in relevant part text *supra* at note 10.

**79.** *NTEU, supra* note 31, 3 F.L.R.A. at 775.

**80.** *Id.* Finding no pertinent legislative history or contradictory statutory language, the Authority relied upon the plain meaning of the word "direct" in construing this statutory phrase. *Id.; see Webster's Third International Dictionary* (unabridged) (1976). It goes almost without saying that this is an established and satisfactory technique of statutory construction. See, *e.g., Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199 & nn. 20–21, 96 S.Ct. 1375, 1384 & nn. 20–21, 47 L.Ed.2d 668, 680 & nn. 20–21 (1976); *Lubrizol Corp. v. EPA,* 183 U.S. App.D.C. 288, 297, 562 F.2d 807, 816 (1977).

timetables for work completion.[81] Management exercises these rights, in the Authority's view, "through supervising and determining the quality and timeliness of work production and establishing priorities for its accomplishment." [82] In sum, the Authority concluded that, by virtue of the provisions of Section 7106(a), management retained the nonnegotiable right to determine what work will be done, and by whom and when.

The Authority also considered this right properly exercisable in part through formulation of performance standards for critical job elements. After reviewing Section 4302 [83] and the Office of Personnel Management's regulations thereunder,[84] the Authority ascertained that

> performance standards established the minimum level of job performance required of an employee. . . . Critical elements are those components of the job which are of sufficient importance that failure to achieve the level . . . estab-

lished in the performance standard requires remedial action.[85]

Thus understood, performance standards for critical job elements were deemed by the Authority to be directly determinative of the level of work output and caliber of work product to be achieved.[86] In the Authority's view, these standards are more than mere ex post facto measures of employee performance; they mark out beforehand the amount, quality and timeliness of the work employees are to perform. Negotiations on these aspects of a performance-appraisal system, the Authority declared, would "require an agency to bargain the quantity, quality, and timeliness standards which it must establish in making work assignments and directing employees." [87] Formulation of performance standards for critical job elements was therefore held to fall within the scope of management's reserved right to "direct employees" and "assign work." [88]

We can find no error in this reasoning.[89]

**81.** *NTEU, supra* note 31, 3 F.L.R.A. at 775.

**82.** *Id.* at 775–776.

**83.** 5 U.S.C. § 4302 (Supp. IV 1980); see notes 37–41 *supra* and accompanying text. The Senate Report accompanying the Act, in discussing § 4302, states:

> The section specifically encourages employee participation in establishing performance objectives. Experience has shown that doing so motivates employees to accomplish the objectives. Management will have the ultimate responsibility under this section, however, to establish performance standards.

S.Rep.No. 95–969, 95th Cong., 2d Sess. 41 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 2723, 2763. The last sentence appears to support quite strongly the construction given § 7106(a) by the Authority in this case. See notes 89–90 *infra* and accompanying text. The Authority, however, did not rely upon this statement, and instead focused its attention upon the provisions of the Act itself. See *NTEU, supra* note 31, 3 F.L.R.A. at 773, 775. In reviewing that decision, we concentrate on the legislative history of the Act as well as its text. See notes 89–95 *infra* and accompanying text.

**84.** 5 C.F.R. § 430.202(d)–(e) (1982); see notes 37–38 *supra* and accompanying text.

**85.** *NTEU, supra* note 31, 3 F.L.R.A. at 774 (footnote omitted).

**86.** *Id.*

**87.** *Id.* at 778.

**88.** *Id.* (footnote omitted).

**89.** Like the Authority, see *id.* at 776–777, we are not troubled by petitioner's plaint that this construction of the Act varies from holdings of its predecessor, the Federal Labor Relations Council. See Brief for Petitioner at 23–25. The Act specifies:

> Policies, regulations, and procedures established under and decisions issued under Executive Orders 11491, 11616, 11636, 11787, and 11838, or under any other Executive order, as in effect on the effective date of this [Act], shall remain in full force and effect until revised or revoked by the President, or unless superseded by specific provisions of this [Act] or by regulations or decisions issued pursuant to this [Act].

5 U.S.C. § 7135(b) (Supp. IV 1980). We discern in this language no impediment to changed statutory interpretations by the Authority, for this provision in terms preserves the efficacy of rulings under preexisting executive orders only to the extent that they are not "superseded by specific provisions of" the Act "or by regulations or decisions issued pursuant" thereto. Not surprisingly, the Act's legislative history similarly evinces a congressional determination not to bind the newly-created

Without a doubt, the right to determine what work will be done, and by whom and when it is to be done, is at the very core of successful management of the employer's business, whether a private-sector enterprise or the public service operations of a federal agency. It follows necessarily that this right is essential to management's ability to achieve optimum productivity, and accordingly to the agency's ability to function in an effective manner. The Authority's construction of Section 7106(a) as a reservation of this invaluable right to management, thereby insulating it from dilution at the bargaining table, is thus fully obedient to the congressional command that the Act be interpreted in a manner consistent with the exigencies of efficient government.[90]

■ The Authority's holding with regard to the nature of performance-appraisal systems similarly respects the Act's legislative history. Just what effect performance standards have in the workplace is, as the present litigation illustrates, a matter on which reasonable people may well differ;[91]

and, like the distinction between negotiable agency procedures and nonnegotiable substantive managerial authority which we reviewed in *Department of Defense*, any assessment of the impact calls for an exercise of "judgment and balance."[92] In concluding that performance standards for critical elements of an employee's job not only serve as a basis upon which past employee performance can be measured, but also tend in the first instance to establish the level of output that is to be achieved, the Authority made a judgment and balance we are not at liberty to disturb. As we said in *Department of Defense*, Congress anticipated that issues arising under the Act requiring expert judgment on federal labor-management relationships would be resolved by the Authority as the agency entrusted with the responsibility for policy in that area.[93] We thus find no "compelling indication[s] of error"[94] in the Authority's determination that prescription of performance standards and identification of critical job elements are confined exclusively to management by Section 7106(a).[95]

Authority inextricably to determinations made by the Council. See, *e.g.*, 124 Cong.Rec. 29200 (1978) (remarks of Representative W. Ford) (section was intended to make clear that the Authority is not to repeat past mistakes of Council in area of federal labor-management relations), reprinted in *Legislative History, supra* note 59, at 958; 124 Cong.Rec. 29188 (1978) (remarks of Representative Clay) (section expresses recognition that new Authority is not to duplicate Council's errors, but instead is to issue decisions superseding those of Council), reprinted in *Legislative History, supra* note 59, at 933. Moreover, as we noted in *Department of Defense*, "Congress plainly viewed § 7106, if not [the Act] as a whole, as a departure from the law that had developed under a comparable section of Executive Order 11491." 212 U.S.App.D.C. at 279, 659 F.2d at 1163.

**90.** See 5 U.S.C. § 7101(b) (Supp. IV 1980); notes 5 & 10 *supra* and accompanying text. Our ruling on this point harmonizes with *Department of Defense*, wherein we upheld the Authority's construction of § 7106(a) as a reservation of limited management discretion in employee selection, *Department of Defense v. FLRA, supra*, note 15, 212 U.S.App.D.C. at 278, 659 F.2d at 1162—a construction dictated, we said, by the same statutory command. *Id.*

**91.** See *Department of Defense v. FLRA, supra* note 15, 212 U.S.App.D.C. at 267, 659 F.2d at 1151.

**92.** *Id.* at 277, 659 F.2d at 1161; see notes 74–75 *supra* and accompanying text.

**93.** 212 U.S.App.D.C. at 277, 659 F.2d at 1161; see 5 U.S.C. § 7105(a)(1) (Supp. IV 1980), reading:

The Authority shall provide leadership in establishing policies and guidance relating to matters under this [Act], and, except as otherwise provided, shall be responsible for carrying out the purpose of this [Act].

**94.** See text *supra* at note 57.

**95.** Section 7106 also endows management with the right to "lay off, and retain employees." 5 U.S.C. § 7106(a)(1) (Supp. IV 1980); see text *supra* at note 11. The legislative history of the section demonstrates that, in reserving this power, "Congress sought ... to strengthen the authority of federal management to hire and to discipline employees." *Department of Defense v. FLRA, supra* note 15, 212 U.S.App.D.C. at 261, 659 F.2d at 1145, citing H.R.Rep.No. 95–1403, 95th Cong., 2d Sess. 4 (1978), reprinted in *Legislative History, supra* note 59, at 680; S.Rep.No. 95–969, 95th Cong., 2d Sess. 4 (1978), reprinted in *Legislative History, supra*

■ Nor can we say that the Authority misapplied Section 7106(a), so construed, to the union proposal in issue here. In reviewing the Authority's application of the Act to the facts of the case, we need only find that its action was neither arbitrary, capricious, abusive of discretion nor contrary to law.[96] The Authority's holding clearly meets that test. Petitioner's proposal would set up batch-processing as a critical job element and nine batches per hour as the performance standard.[97] Affirming, as we do, the Authority's interpretation of Section 7106(a), we cannot say that its finding that the proposal would conflict with management's right thereunder to direct employees and assign work is either arbitrary, capricious or a misapplication of discretion.

It is important to note that the agency construction of Section 7106(a) which we approve today does not preclude bargaining between management and employees on matters not directly related to the substantive components of performance standards or critical elements of the job. Section 4302(a)(2) of the Act instructs federal agencies to encourage employee participation in the establishment of performance standards,[98] but does not specify the manner in which that participation should occur. The Authority, in its decision, indicated that the form which employee participation will assume is within agency discretion, but nonetheless is an appropriate subject for negotiation.[99] The Authority thus remains responsive to the statutory direction to in some way afford to employees ample opportunity for input on what the standards should be, and has drawn the line only on a role enabling employee veto of such standards as the agency ultimately deems necessary. We find no fault in this position.

We are advertent, too, to Section 7106(b), which specifically directs agency officials to bargain over the procedures to be used in exercising managerial authority, and over the arrangements appropriate for employees adversely affected by such exercises.[100] The agency may thus be required, in compliance with Section 4302's mandate of employee participation,[101] to negotiate on procedures governing establishment of performance standards and identification of critical job elements. The Office of Personnel Management, in the proceeding under review, suggested a variety of procedural implications of performance-appraisal systems over which an agency might need to bargain.[102]

Lastly, as the Authority also recognized,[103] any employee may challenge an

note 59, at 746. This objective is, of course, consistent with the congressional resolve to ensure efficient and effective governmental operations. See notes 4–11 and accompanying text. We note in this regard that performance standards for critical job elements, to the extent that they establish the level of achievement necessary for job retention, appear to implicate management's reserved prerogative to "lay off, and retain" employees. The Authority, however, did not advance this line of reasoning in its decision, and it is not necessary for us to express any view as to validity.

**96.** *Department of Defense v. FLRA, supra* note 15, 212 U.S.App.D.C. at 279–280, 659 F.2d at 1163–1164; see 5 U.S.C. § 7123 (Supp. IV at 1980); *id.* § 706 (1976); see text *supra* at note 52.

**97.** See note 31 *supra* and accompanying text.

**98.** 5 U.S.C. § 4302(a)(2) (Supp. IV 1980).

**99.** *NTEU, supra* note 31, 3 F.L.R.A. at 778.

**100.** 5 U.S.C. § 7106(b) (Supp. IV 1980), providing:

Nothing in this section shall preclude any agency and any labor organization from negotiating—

(1) at the election of the agency, on the numbers, types, and grades of employees or positions assigned to an organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;

(2) procedures which management officials of the agency will observe in exercising any authority under this section; or

(3) appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials.

**101.** See text *supra* at note 98.

**102.** See *NTEU, supra* note 31, 3 F.L.R.A. at 778.

**103.** *Id.*

established performance standard in the context of a grievance proceeding conducted pursuant to the Act.[104] Thus, should disciplinary action be taken against an employee on the ground of unacceptable performance, that employee may claim during an ensuing grievance proceeding that the standard by which his or her performance was measured is not objective or not job-related,[105] or that it is inherently impossible of performance. Our decision today does not deprive federal employees of input into the development of performance-appraisal systems, or their ability to challenge components of such a system once in place.

We sustain, then, the Authority's construction of Section 7106(a) as consistent with the Act and its legislative history. We also uphold the Authority's application of that section, as construed, in the case at bar. Accordingly, the decision reviewed herein is

*Affirmed.*

---

**104.** 5 U.S.C. §§ 7701(c)(1)(A) (Supp. IV 1980); see *id.* § 7121(e)(2).

**105.** See *id.* § 4302.